CASANUEVA, Chief Judge.
L.J. is the undisputed biological father of the minor at issue in this paternity action who was conceived while the mother, A.S., was married to another man. L.J. has repeatedly petitioned for a finding of paternity, custody, and other relief, the latest of which was dismissed summarily because the circuit court found that he lacked standing as a matter of law. We reverse and write to explain why the unusual circumstances in this case require that he be given an opportunity to establish that he has standing.
Background
A.S. married M.A., a foreign national, on October 23, 2002. M.A. instituted dissolution proceedings for this marriage on December 3, 2002. In approximately late December 2002 or early 2003, while the dissolution proceedings were pending, A.S. had intimate relations with L.J. — and, she later claimed, with only L.J. in this time period — that resulted in the conception of the child at issue. A.S. did not appear in the dissolution proceedings, and a final judgment of dissolution after default was entered on April 25, 2003.[1],[2] The child of L.J. and A.S. was born on October 13, 2003.[3]
Proceedings In The Circuit Court
Since his child’s birth, L.J. and the paternal grandparents have been substantially involved in the child’s life; there have been frequent gifts; L.J. has paid child support and regularly exercised visitation rights, and the paternal grandparents were awarded physical custody for a period of time.[4] He also claims that he has registered with the State’s Putative Father Registry. He has been involved in numerous proceedings regarding his child, both as petitioner and respondent, including two prior petitions to establish paternity; his latest petition for paternity was filed in June 2008 and was dismissed with prejudice in October 2008. The circuit court explained L.J.’s lack of success in estab *1286 lishing his undisputed paternity in the final order on appeal:
THIS CAUSE came before the Court pursuant to a review by the case management division, which had noticed there were other filings involving the same parties and same cause of action. Upon a review of the case file and related case history, this Court finds as follows:
1. This is the Petitioner’s [L.J.’s] third attempt to file a paternity action with this Court. His first was filed pro se in 2005, his second “re-filed” by his attorney in 2006. Those cases were consolidated in Division I and dismissed by Judge Martha Cook on January 25, 2008 for lack of standing. The instant case was filed June 3, 2008. The Petitioner failed to fill out a “Notice of Related Cases” form as required by Administrative Order.
2. Judge Cook explained at the hearing in January 2008 the law and reason behind her dismissal. The Petitioner and his then-counsel, as well as the Respondent [A.S.], were present for this hearing. The Petitioner was told that he had no right to petition for paternity because the law prevented him from doing so due to the fact the Respondent was married at the time the child was conceived. It was explained how under the law, a child that is born to a marriage is presumed to be that of the married couple. This presumption is very difficult to overcome, and can only be rebutted by two people: The legal father himself [M.A.] (i.e. in an action to disavow his legal responsibility), or mother (i.e. in an action to terminate the parental rights of the legal father based on his abandonment or some other detriment to the child).
3. Had Mother been unmarried at the time of pregnancy and birth, Petitioner’s standing would be different. But here, even though he is the biological father, Petitioner has no legal right to bring a paternity action where the legal father’s parental rights are intact and neither the mother nor the legal father has petitioned to disavow his obligation. This was explained to counsel, and the Petitioner ostensibly had the benefit of that advice before attempting to file this third identical petition.
4. This hearing, however, was not the first time the issue of standing had been brought up. The Respondent stated at the Judge Cook hearing that she had attempted to sue the Petitioner for the support due and owing under a mediated settlement contract she and the Respondent entered into in October 2007. This mediated agreement originated during the course of the Petitioner’s original filing for paternity when a routine referral to family law mediation resulted in a settlement. This settlement, however, was entered into prior to the court having substantively reviewed the file and prior to its discovery that the Petitioner’s lacking standing meant the Court had no jurisdiction to entertain his petition.
5. When the Respondent attempted to enforce this October 2007 contract, she testified that the Department of Revenue explained to her that she had no cause of action against the Petitioner because he was not the legal father of the minor children. This was reiterated by Judge Cook at the January 2008 hearing, where the Respondent/Mother was questioned about her understanding of her rights under the contract and understood that if she expected to sue for child support from the Petitioner then she was going to have to take action to remove the legal father, first.
*1287 6. The Mother has chosen not to go that route, evidently, as on January 14, 2008 (prior to the hearing before Judge Cook) the Department of Revenue filed a child support enforcement petition against the legal father. This makes it appear clear that it is not the Respondent’s intention to petition to set aside her ex-husband’s legal claim to the child; ergo the only person with standing to initiate such a petition at this point appears to be the legal father/ex-husband, himself.
7. Meanwhile, as per the Mother’s testimony at the hearing before Judge Cook, the legal father was, as of January 2008, “no where to be found.” The child support petition that was filed by DOR against the ex-Husband (which is public record) includes a signed waiver and address for the ex-husband/legal father. This waiver is dated nearly a year earlier (May 30, 2007)[FN1] which times the ex-husband’s signature has [sic] having been procured square in the middle of the Petitioner’s paternity filings (this assumes the wavier [sic] is valid)
8.The timing of this wavier [sic] also pre-dates the October 2007 agreement made between the Petitioner and Respondent of the instant case. This suggests that the Respondent had the legal father’s waiver [FN2] held “in her pocket” while she at the same time attempted to negotiate a support contract with the Petitioner. This implies a lack of good faith on her part in engaging in that agreement; therefore, any monies she received under that contract might be a cause for damages for the Petitioner, since they were not “rightfully obligated support” under the law. However, this is not a matter that can be settled by the Family Court, and instead is a civil litigation issue. If the Petitioner wishes to pursue it, he shall have to file a petition in that venue.
9. It is unknown if the legal father was aware of the paternity actions that had been filed by the Petitioner when he (the legal father) waived service of any future child support action. Without locating the legal father and asking him directly, we have no way to determine what his intentions toward the child were in signing that document, but if the waiver is valid, then the legal father ostensibly expected to be held responsible for the child.
10. Just as the Respondent cannot enforce payment of the support under the October 2007 agreement, the Petitioner cannot enforce visitation. This was the subject of his motion to the Court when Judge Cook first became aware of the situation. It was upon her review of the file and case history that she learned she had no jurisdictional authority to enforce the agreement that arose in that case as the party who initially filed the cause of action (namely the Petitioner), had no standing. That is why the case was dismissed.
11. This was truly an unfortunate chain of events, but it has resulted in a situation where the Petitioner simply has no right to change the status quo — that right belongs exclusively to the Respondent, or to the legal father. They are the only people at this point with the right to remove the legal father from responsibility and thereby clear the way *1288 for a ruling on the status of the Petitioner, who is apparently the biological father of the child as supported by a DNA test. Unfortunately, under the law mere biology is not enough in certain situations to give you rights. The Petitioner had an affair with a woman who was still married, and the public policy stands that he is thereby put at the disadvantage when it comes to asserting his rights over any child that might have resulted from that union.
It is therefore ORDERED AND ADJUDGED that Petitioner’s paternity action is DISMISSED WITH PREJUDICE. This means that the Petitioner may not file this same cause of action again. If he disregards this notice and does so, then his petition is subject to immediate dismissal and his filing fee is forfeit. This dismissal has no effect[,] however, on the Petitioner’s right to file a civil action against the Respondent for damages incurred because of the October 2007 contract.
The CLERK OF THE COURT is directed to dispose of this action accordingly.
Analysis
We agree with the circuit court that L.J. has suffered from “truly an unfortunate chain of events,” so much so that to deny him an opportunity to succeed in this endeavor will certainly create a manifest injustice to both him and his child. Cf. State, Dep’t of Revenue, Office of Child, Support Enforcement ex rel. D.J.N. v. Redding, 685 So.2d 1000, 1002 (Fla. 3d DCA 1997) (noting that “a paternity action cannot be viewed as if it were simply ordinary litigation between private parties .... Important considerations of public policy are involved as well.”); Dep’t of Health & Rehabilitative Servs. v. Alper, 375 So.2d 571, 572 (Fla. 4th DCA 1979) (affirming an order denying the Department recoupment of its costs in an action for child support as deductions from the child support payments collected and finding “that the child was in need of all available monies and that recoupment of costs by the Department would result in a manifest injustice to the child”).
Because of its close factual similarity, we find persuasive the opinion in Kendrick v. Everheart, 390 So.2d 53 (Fla.1980), and conclude the supreme court’s disposition must be mirrored here. As the supreme court reasoned:
With regard to a putative father’s general standing to assert an interest in or on behalf of his illegitimate children, we add one further comment. Because of dissimilarities in their circumstances, policy considerations and problems of proof, a putative father of an illegitimate child has historically not been accorded all the parental rights which are enjoyed by the natural mother and a married father. Conversely, the putative father has not always shared the same parental responsibilities which are imposed on the natural mother and the married father. As in the past, the law will in the future continue to develop to reflect the changing demands, needs and perceptions of a dynamic society. The fact remains, however, that the unwed father is not in all respects similarly situated with the unwed mother or the married father. This fact constitutionally permits the state to distinguish between them when the state does so on a basis realistically related to the differences in their situations. As a consequence of the differences in their situations, the unwed father is required to show that he has manifested a substantial concern for the welfare of his illegitimate child before he may be accorded, standing to assert an interest with respect to that child. In this case appellant has appar *1289 ently established a familial relationship with his illegitimate children by raising and supporting them. In doing so he has manifested a substantial and continuing concern for the welfare of his children. As a result, we conclude that he has standing to bring this suit.
Id. at 60-61 (citations omitted; emphasis added); see also Van Nostrand v. Olivieri, 427 So.2d 374 (Fla. 2d DCA 1983) (holding that as a condition of obtaining an adjudication of paternity, the putative father must prove standing by showing “that he has manifested a substantial concern for the welfare of his illegitimate child” (quoting Kendrick, 390 So.2d at 60)).
Conclusion
The child at issue here has a biological father willing, able, indeed eager, to parent and support his offspring; a legal father who apparently is not; and a mother who apparently wishes to deprive the child of a real father by declining to institute proceedings to divest her ex-husband of his legal parental rights.[5] In light of Kendrick and Van Nostrand, we conclude the circuit court erred in dismissing L.J.’s petition with prejudice based on lack of standing as a matter of law and without a hearing to afford L.J. the opportunity to establish his standing. As noted in Van Nostrand, 427 So.2d at 377-78, a bifurcated proceeding, analogous to an action for an accounting where the plaintiff must first establish his right to an accounting before he is entitled to discovery on the accounting itself, may be necessary on remand. See Fla. R. Civ. P. 1.270(b) (authorizing a separate trial of any issue to avoid prejudice). Given what we understand to be the background of this case, that should be a first hurdle easily overcome. Once his standing is established, the substantive issues of paternity, custody, and other relief can be decided.
The order dismissing L.J.’s petition with prejudice based on lack of standing is reversed; the case is remanded to the circuit court with instructions to reinstate the petition and conduct further proceedings in accord with this opinion.
KELLY and CRENSHAW, JJ., Concur.

. There have been numerous proceedings regarding this child, legally born of the A.S./ M.A. marriage, unrelated to this paternity petition in which M.A. has not appeared, and neither L.J. nor A.S. can determine his whereabouts. We note this merely to point out that he has shown no interest in this child and perhaps is unaware of its existence because at the time he filed for dissolution, A.S. was not pregnant. As far as we can tell from the record before the court, he has not been seen or heard from since May 2007.

. L.J. in his pro se brief to this court makes a strong argument claiming that the A.S./M.A. marriage was a "sham,” only entered into to allow M.A. to remain in this country to complete his education. Be that as it may, we do not find the issue of whether it was a sham marriage relevant to our inquiry.

. We have considered the status of M.A. in this case to be the child’s "legal father” because the child was conceived during his marriage to A.S. Cf. In re Adoption of Doe, 572 So.2d 986, 988 (Fla. 1st DCA 1990) (stating that a child bom or conceived during a lawful marriage is a legitimate child) (emphasis added) (cited with approval in Daniel v. Daniel, 695 So.2d 1253, 1255 (Fla.1997)). M.A.'s status as the "legal father” is beyond the scope of this opinion. We leave to another day the question of whether a man in his position, married to the mother at the time of the child's conception but divorced before the child is born, and whose name is not on the birth certificate, can be considered the "legal father.”

.L.J.’s appendix to his initial brief contains a copy of a predisposition study prepared after his child and two older half-siblings were removed from A.S.'s custody on child neglect grounds. In this report, the case worker noted that the child, then currently placed with L.J. and his parents, was very bonded with him and his family.

[FNl: Though the waiver is signed May 2007, the case number and styling is written in by pen and reflects the 2008 filing date. This shows that the Respondent/Mother apparently held on to this waiver for a year before giving it to the DOR to use in filing its petition.]

[FN2: The waiver is typewritten and has the exact case styling as the rest of the January 2008 petition. Only the case number is written in pen.]

. We note that, contrary to the circuit court's statement, there appears no obstacle to L.J.'s instituting an action to terminate the parental rights of M.A. See § 39.802(1), Fla. Stat. (2009) (stating that all proceedings seeking to terminate parental rights may be initiated by "any other person who has knowledge of the facts alleged or is informed of them and believes that they are true”), and § 39.803(5) (providing that in a proceeding for termination of the parental rights of a parent whose whereabouts are unknown, the court may, if it finds that the best interest of the child requires proceedings without actual notice to that parent, proceed without a diligent search for the missing parent).