SAWAYA, J.
The issue we must resolve is whether two women involved in a lesbian relationship for several years share parental rights and responsibilities to a child born out of that relationship. The two women are Appellant, the biological mother, and Appellee, the birth mother. This is a case of first impression in Florida.
I. Factual and Procedural Background
The facts are not in dispute. Appellant and Appellee were involved in a committed relationship from 1995 until 2006. They lived together and owned real property as joint tenants, evidenced by a deed in the record. Additionally, both women deposited their income into a joint bank account and used those funds to pay their bills.
The couple decided to have a baby that they would raise together as equal parental partners. They sought reproductive medical assistance, where they learned Appellee was infertile. Appellant and Ap-pellee, using funds from their joint bank account, paid a reproductive doctor to withdraw ova from Appellant, have them fertilized, and implant the fertilized ova into Appellee. The two women told the reproductive doctor that they intended to raise the child as a couple, and they went for counseling with a mental health professional to prepare themselves for parenthood. The in vitro fertilization procedure that was utilized proved successful, and a child was conceived.
The child was born in Brevard County on January 4, 2004. The couple gave the *789 child a hyphenation of their last names. Although the birth certificate lists only Appellee as the mother and does not indicate a father, a maternity test revealed that there is a 99.99% certainty that Appellant is the biological mother of the child. Appellant and Appellee sent out birth announcements with both of their names declaring, “We Proudly Announce the Birth of Our Beautiful Daughter.” Both women participated at their child’s baptism, and they both took an active role in the child’s early education.
The women separated in May 2006, and the child lived with Appellee. Initially, Appellant made regular child support payments, which Appellee accepted. Appellant ended the support payments when she and Appellee agreed to divide the child’s time evenly between them. They continued to divide the costs of education. The child treated both women as parents and did not distinguish between one being the biological or the birth parent.
The parties’ relationship further deteriorated, and the affection each once had for the other eventually turned to animus. Appellee severed Appellant’s contact with the child on December 22, 2007, when Ap-pellee quit her job and moved with the child to an undisclosed location. Eventually, Appellant located them in Queensland, Australia, and there served Appellee with the underlying lawsuit.[1]
Appellee filed a Verified Motion for Summary Judgment, which alleged that the facts were not in dispute and that she was entitled to summary judgment as a matter of law. Appellant accepted Appel-lee’s facts for the purpose of summary judgment. The trial judge held a hearing on the motion and issued the final summary judgment in favor of Appellee. In ruling as he did, the trial judge stated that he felt constrained by the state of the law and expressed his hope that this court would reverse the ruling:
THE COURT: First, let me say, I find that [Appellee’s] actions to be — this is my phraseology — morally reprehensible. I do not agree with her actions relevant to the best interest of the child. However, that is not the standard. There is no distinction in law or recognition of rights of the biological mother verses a birth mother. If a contract is not binding in this situation, then intent is not relevant under these circumstances.
Same-sex partners do not meet the definition of commissioning couple. There really is no protection for [Appellant] under Florida law because she could not have adopted this child to prevent this current set of circumstances. I do not *790 agree with the current state of the law, but I must uphold it. I believe the law is not caught up with science nor the state of same-sex marriages. I do think that is on the horizon.
The trial court then stated to Appellant, “If you appeal this, I hope I’m wrong.” Appellant has appealed. In order to determine whether the trial judge was wrong in entering summary judgment in favor of Appellee, as Appellant argues, we must apply the de novo standard of review. See Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000); Krol v. City of Orlando, 778 So.2d 490, 491 (Fla. 5th DCA 2001).
Appellee advances several arguments in support of the summary judgment in her favor. She argues that section 742.14, Florida Statutes, denies an ovum donor any parental rights to the child. Appellee next argues that she and Appellant could not legally qualify to adopt a child and, therefore, the Legislature forbids gay or lesbian couples from sharing parental rights to a child. Appellee further argues that an implied consent form executed at the reproductive doctor’s office included a written waiver that relinquished Appellant’s parental rights to the child. Finally, Appellee asserts that since she and Appellant have separated, she has sole parental rights as the birth mother.
Appellant observes that this is a case of first impression in Florida and argues that the existing law does not contemplate the situation of a dispute between a biological mother and a birth mother and that there is nothing in the provisions of chapter 742 that applies to deny her parental rights to her child. Alternatively, Appellant challenges the constitutionality of chapter 742, including the provisions of section 742.14. Appellant also argues that the implied consent form did not include a binding waiver of her parental rights.
Our analysis reveals that there is nothing in chapter 742, and specifically section 742.14, that addresses the situation where the child has both a biological mother and a birth mother who were engaged in a committed relationship for many years and who decided to have a child to love and raise together as equal parental partners. This is a unique case, and the appellate courts in Florida have never before considered a case quite like it. Based on the facts and circumstances of this ease, we can discern no legally valid reason to deprive either woman of parental rights to this child. The women were in a committed relationship for many years and both decided and agreed to have a child born out of that relationship to love and raise as their own and to share parental rights and responsibilities in rearing that child. Specifically, when it was discovered that Ap-pellee was infertile, both women agreed to have ova removed from Appellant, to have them artificially inseminated with the sperm of a donor, and to have the ova inserted into Appellee’s womb, in order to conceive a child that they would raise together as parental partners. After the child was born, both women were parents to the child and equally cared for the child for several years.
II. Application and Interpretation of Section 742.14 by the Trial Court and the Dissent.
The trial court held that Appellant is a “donor” of her ova and that the provisions of section 742.14 apply to deny Appellant parental rights to her child. Section 742.14 provides that:
Donation of eggs, sperm, or preembr-yos
The donor of any egg, sperm, or preem-bryo, other than the commissioning couple or a father who has executed a preplanned adoption agreement under s. *791 63.212, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children. Only reasonable compensation directly related to the donation of eggs, sperm, and preembryos shall be permitted.
The terms “donor” and “donation” are not defined in chapter 742, and when the Legislature does not define terms in a statute, the courts generally look to the plain and ordinary meaning of the terms. Greenfield v. Daniels, 51 So.3d 421 (Fla.2010). “Further, it is a well-settled rule of statutory construction that in the absence of a statutory definition, courts can resort to definitions of the same term found in case law.” Rollins v. Pizzarelli, 761 So.2d 294, 298 (Fla.2000); LaMorte v. State, 984 So.2d 548, 552 (Fla. 2d DCA 2008).
In K.M. v. E.G., 37 Cal.4th 130, 33 Cal.Rptr.3d 61, 117 P.3d 673 (2005), which is one of two cases we have found with facts similar to the instant case, the court held that a lesbian woman who provided her ova to her lesbian partner was not a donor of her ova. The court reasoned that there was no “true egg donation” because “K.M. did not intend to simply donate her ova to E.G., but rather provided her ova to her lesbian partner with whom she was living so that E.G. could give birth to a child that would be raised in their joint home.” Id. at 679. The following excerpt from K.M. accurately states the issue, the holding of the court, and how the court utilized the pertinent terminology:
In the present case, we must decide whether a woman who provided ova to her lesbian partner so that the partner could bear children by means of in vitro fertilization is a parent of those children. For the reasons that follow, we conclude that Family Code section 7613, subdivision (b), which provides that a man is not a father if he provides semen to a physician to inseminate a woman who is not his wife, does not apply when a woman provides her ova to impregnate her partner in a lesbian relationship in order to produce children who will be raised in their joint home. Accordingly, when partners in a lesbian relationship decide to produce children in this manner, both the woman who provides her ova and her partner who bears the children are the children’s parents.
The circumstances of the present case are not identical to those in Johnson, but they are similar in a crucial respect; both the couple in Johnson and the couple in the present case intended to produce a child that would be raised in their own home. In Johnson, it was clear that the married couple did not intend to “donate” their semen and ova to the surrogate mother, but rather permitted their semen and ova to be used to impregnate the surrogate mother in order to produce a child to be raised by them. In the present case, K.M. contends that she did not intend to donate her ova, but rather provided her ova so that E.G. could give birth to a child to be raised jointly by K.M. and E.G. E.G. hotly contests this, asserting that K.M. donated her ova to E.G., agreeing that E.G. would be the sole parent. It is undisputed, however, that the couple lived together and that they both intended to bring the child into their joint home. Thus, even accepting as true E.G.’s version of the facts (which the superior court did), the present case, like Johnson, does not present a “true ‘egg donation’ ” situation. (Johnson v. Calvert, supra, 5 Cal.4th 84, 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) K.M. did not intend to simply donate her ova to E.G., but rather provided her ova to her lesbian partner with whom she was living so that E.G. could give birth to a *792 child that would be raised in their joint home. Even if we assume that the provisions of section 7613(b) apply to women who donate ova, the statute does not apply under the circumstances of the present case. An examination of the history of 7613(b) supports our conclusion.
33 Cal.Rptr.3d 61, 117 P.3d at 675, 679 (emphasis added). Based on the uncontra-dicted facts, Appellant would not be a donor under this definition because she did not intend to give her ova away. Rather, she always intended to be a mother to the child born from her ova and was a mother to the child for several years after its birth.
The dissent contends, however, that what the Legislature really meant by donation was any transfer or provision of ova or sperm to another and that intent is not an issue. The dissent interprets the “donor” and “donation” requirement by utilizing the exceptions in the statute. The dissent does this by proclaiming that commissioning couples, defined as a man and a woman, are permitted to retain their parental rights under the statute and that lesbian couples are not. According to the dissent, it does not matter if the individual providing the ova to her lesbian partner does so for the sole purpose of conceiving her own child; if the ova is provided or, in the vernacular of the dissent, “transferred,” the transferor loses her parental rights under the statute. The dissent essentially attempts to substitute the terms “transferor” or “provider” and “transfer” or “provide” for the statutory terms “donor” and “donation.” This interpretation not only eliminates Appellant’s right to procreate and parent a child of her own by transferring her ova to her lesbian partner through the use of assisted reproductive technology, it eliminates that right for all lesbian couples. This interpretation of the statute is also applied to eliminate the right of the Appellant to parent her child after she had done so for several years after the child was born. This is the interpretation given the statute by the trial court, and this is how the trial court applied the statute in the instant case.
This interpretation and application of the statute violates Appellant’s constitutional rights to equal protection and privacy. Therefore, based on the trial court’s interpretation of the statute, we must reverse the judgment under review.
A. Section 742.14 as Interpreted and Applied by the Trial Court Renders the Statute Unconstitutional Because It Violates Appellant’s Constitutionally Protected Rights.
It is well established that the rights to procreate and to parent one’s child are fundamental rights under both the Florida Constitution[2] and the United States Constitution.[3] Statutes that inter *793 fere with a fundamental right are presumptively unconstitutional and subjected to strict scrutiny, meaning that the proponent of the statute is required to demonstrate that the statute furthers a compelling government interest through the least intrusive means. N. Fla. Women’s Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 625 n. 16 (Fla.2003); Winfield v. Div. of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985). Even if an intermediate level of scrutiny is applied, the burden is on the proponent of the statute to show it does not violate the constitution. N. Fla. Women’s Health, 866 So.2d at 625-26.
Interpretation and application of this statute by the trial court to deny Appellant parental rights to her child cannot withstand strict scrutiny and violates Appellant’s constitutional rights to equal protection and privacy under the United States[4] and Florida[5] Constitutions. See Lawrence v. Texas, 539 U.S. 558, 574, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (stating that constitutional protections are provided to individuals making personal decisions relating to such matters as procreation and child-rearing because the Constitution demands respect for the autonomy of the person making these decisions and that “[pjersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do”); Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (stating that the Constitution “provides heightened protection against government interference with certain fundamental rights and liberty interests,” which include the right “to have children”); Carey v. Population Servs., Int’l, 431 U.S. 678, 686, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (“[Wjhere a decision as fundamental as ... whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests.”); Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (“[Tjhere is a right ‘to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.’ ” (quoting Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972))); Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Beagle v. Beagle, 678 So.2d 1271, 1276 (Fla.1996); Grissom v. Dade County, 293 So.2d 59, 62 (Fla.1974); Latera v. Isle at Mission Bay Homeowners Ass’n, Inc., 655 So.2d 144, 145 (Fla. 4th DCA) (citing Skinner and recognizing that procreation is a right that has been designated by the United States Supreme Court as a fundamental right guaranteed by the Constitution), review denied, 666 So.2d 144 (Fla.1995). Here, Appellee clearly failed to meet her burden of showing that section 742.14 withstands strict scrutiny and does not violate the constitution.
We totally reject the argument made in the dissent that Appellant never had any parental rights and that the strict scrutiny test is, therefore, inapplicable. The very statute the trial court applied to deprive Appellant of her parental rights recognizes her parental rights to her child. Section 742.14 specifically states, in pertinent part, that “the donor of any egg ... shall relinquish all maternal or paternal rights and obligations with respect to ... the resulting children.” One cannot relinquish a *794 right that one never had. Hence, if Appellant is a donor and the statute applies as the trial court held, then the statute itself recognizes Appellant’s parental rights to her child and then proceeds to declare those rights to be “relinquished.”[6]
Rather than discuss what rights the Appellant relinquished under the statute, the dissent simply argues in support of the trial court’s ruling that the statute applies, relying on what it perceives to be a common law rule that the birth mother is the legal mother and on statutes concerned with vital statistics and adoptions contained in chapters 63 and 382, Florida Statutes. The argument that permeates the dissent is that the birth mother, as the legal mother under this purported common law rule, has all of the parental rights to the child and the biological mother has none.
As to chapter 382, and specifically section 382.013, Florida Statutes, cited in the dissent, it is clear that these provisions were written to facilitate the issuance of birth certificates and the keeping of vital statistics for public health. As to chapter 63, those provisions were enacted to provide procedures for the adoption of children in this state. We do not believe that these provisions were enacted to address a situation where a woman gave live birth to a child with whom she shared no genetic relationship. Moreover, chapters 63 and 382 do not establish parentage or parental rights. Chapter 742, entitled “Determination of Parentage,” is the statutory vehicle by which paternity is established for children born out of wedlock, see section 742.10(1), Florida Statutes, and it is the provisions of section 742.14 that have been applied by the trial court and argued by Appellee to deny Appellant parental rights to her child.
The dissent derives its purported common law rule from two cases from other jurisdictions.[7] In re Adoption of Sebas *795 tian, 25 Misc.3d 567, 879 N.Y.S.2d 677, 679 (N.Y.Sur.Ct.2009), simply discusses the common law of parentage, which involved the marriage of a man to a woman, and states that in the context of that relationship, the woman of a child born out of wedlock is the legal parent. As we note in our subsequent discussion of that case, two lesbian women had a child in the same manner as Appellant and Appellee: one had ova removed from her body to implant in her partner so a child could be conceived by in vitro fertilization. The court held that each woman shared parental rights to the child. We do not believe that the court intended to establish a common law rule that states that the birth mother is presumed to be the sole legal mother to the exclusion of the biological mother.
The second case is In re C.K.G., 173 S.W.3d 714 (Tenn.2005). This case does nothing more than cite a law review article as the authority for the proposition that a common law rule limiting maternal rights to gestational mothers may exist in Tennessee. However, the court clearly noted that “[w]e are not faced with a controversy between a birth ‘mother’ and a genetic ‘mother’ where the genetic and gestational roles have been separated and distributed among two women.” Id. at 730. Hence, the court was careful to point out that this common law rule does not apply in instances similar to the instant case where two women are involved in the procreative process, one as the birth mother and one as the biological mother. The court held that maternal parentage should be decided on a number of factors, including the intent of the parties and the genetics of the mother and child. See id. at 727-29. The common law does not come from law students and professors who write law review articles, and we hardly think it comes from a decision rendered by a Tennessee court that does nothing more than cite a law review article as the source.
Section 2.01, Florida Statutes, cited in the dissent, simply adopts the common law of England down to the 4th day of July, 1776, provided it is not inconsistent with the Constitution and laws of the United States and Florida. The dissent does not cite to any decision from any Florida or *796 English court adopting the purported common law rule and this statute certainly cannot create it on its own. The decision in Gossett v. Ullendorff, 114 Fla. 159, 154 So. 177 (1934), does not hold as the dissent contends that the common law rules discussed in cases from other jurisdictions are adopted as the law in Florida by virtue of this statute. Moreover, that case certainly does not establish or adopt the dissent’s purported common law rule, and we note that the dissent does not say that it does. It is not for us to say whether such a common law rule exists; rather, it should be up to the proponent of it to establish its existence. Furthermore, we do not agree with the dissent’s assertion that we accept this purported common law rule simply because we do not suggest that Appellee as the birth mother may be divested of her rights to parent the child. Appellant is not attempting to divest Appellee of her parental rights and that is not an issue in this case.
Assuming that this common law rule exists, we do not believe that a rule established during a time so far removed in history when the science of in vitro fertilization was a remote thought in the minds of the scientists of the times has much currency today. Yet the dissent uses this purported ancient rule as its basis for arguing that Appellant never had any parental rights to begin with and that even if section 742.14 is inapplicable, she has no parental rights in the end. We reject that argument.
The citation of two decisions from other jurisdictions that adopt what the dissent purports to be a common law rule that the Florida courts have not adopted fails to answer the question of what rights Appellant had that are relinquished by application of section 742.14. The United States Supreme Court has recognized “ ‘the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.’ ” Planned Parenthood v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (quoting Eisenstadt, 405 U.S. at 453, 92 S.Ct. 1029) (emphasis in original). As the Court explained in Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972):
The rights to conceive and to raise one’s children have been deemed ‘essential,’ Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), ‘basic civil rights of man,’ Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and ‘rights far more precious than property rights,’ May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953).
Pursuant to the trial court’s application of section 742.14, the “essential” right of Appellant to “bear or beget a child” are statutorily relinquished. Cf. J.R. v. Utah, 261 F.Supp.2d 1268, 1288 (D.Utah 2002) (stating, “[The] extraordinary process of human childbirth implicates the fundamental procreative rights of the birth mother as well as those of the mother and father whose best efforts at procreation have furnished the embryo”; holding unconstitutional an irrebuttable presumption that the gestational mother is the legal mother of a child to the exclusion of the intended genetic mother because it infringed the genetic mother’s rights to procreate and parent her child).
In addition, pursuant to the trial court’s application of section 742.14, Appellant’s right to form a parental relationship with her child and to continue to participate in raising the child as a parent as she had done for several years after the child was born are statutorily relinquished. “[A] parent’s desire for and right to ‘the *797 companionship, care, custody and management of his or her children’ is an important interest that ‘undeniably warrants deference and, absent a powerful countervailing interest, protection.’ ” Lassiter v. Dep’t of Soc. Servs., 452 U.S. 18, 26, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (quoting Stanley, 405 U.S. at 651, 92 S.Ct. 1208); see also Lehr v. Robertson, 463 U.S. 248, 256, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (“The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection_”). We do not believe that Appellant relinquished any of her parental rights. Moreover, the dissent’s claim that Appellant is not entitled to parental rights in light of her genetic connection to, and relationship with, the child is untenable.
Here, it is undisputed that Appellant formed and maintained a parental relationship for several years after the child was born, and she did so as an equal parental partner with Appellee who, for all that time, never suggested that Appellant had relinquished her parental rights to her child. We believe that Appellant has constitutionally protected rights as a genetic parent who has established a parental relationship with her genetic offspring that transcend the provisions of section 742.14. Lehr, 463 U.S. at 261, 103 S.Ct. 2985 (“When an unwed father demonstrates a full commitment to the responsibilities of parenthood by ‘com[ing] forward to participate in the rearing of his child,’ his interest in personal contact with his child acquires substantial protection under the due process clause.” (quoting Caban v. Mohammed, 441 U.S. 380, 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979))); see also In re Adoption of Baby E.A.W, 658 So.2d 961, 967 (Fla.1995) (stating that substantial constitutional protections apply “when an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in raising his child” and further stating that “[w]e recognize the sanctity of the biological connection, and we look carefully at anything that would sever the biological parent-child link.”); In re Adoption of Doe, 543 So.2d 741, 748 (Fla.1989) (“It is clear from Lehr that the biological relationship offers the parent the opportunity to assume parental responsibilities. Parental rights based on the biological relationship are inchoate, it is the assumption of the parental responsibilities which is of constitutional significance.”); Nevitt v. Bonomo, 53 So.3d 1078 (Fla. 1st DCA 2010); L.J. v. A.S., 25 So.3d 1284 (Fla. 2d DCA 2010); G.F.C. v. S.G., 686 So.2d 1382 (Fla. 5th DCA 1997); Wooley v. City of Baton Rouge, 211 F.3d 913, 923-24 (5th Cir.2000) (applying Lehr to conclude that a biological mother had constitutionally protected parental rights because she had established a parental relationship with her child).[8]
*798 We also note that “the usual understanding of ‘family [for purposes of Due Process protection] implies biological relationships, and most decisions treating the relation between parent and child have stressed this element.” Smith v. Organization of Foster Families For Equality & Reform, 431 U.S. 816, 843, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (citation omitted). Moreover,
the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in “promot[ing] a way of life” through the instruction of children, Wisconsin v. Yoder, 406 U.S. 205, 231-233, 92 S.Ct. 1526, 1541-1542, 32 L.Ed.2d 15 (1972), as well as from the fact of blood relationship.
Id. at 843-44, 97 S.Ct. 2094 (quoting Caban v. Mohammed, 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (Stewart, J., dissenting)); cf. Lehr, 463 U.S. at 262, 103 S.Ct. 2985 (“The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development.”).
We conclude that Appellant is entitled to constitutionally protected parental rights to the child and that the statutory relinquishment of those rights under section 742.14 is prohibited by the Federal and Florida Constitutions. We also conclude that the dissent’s contention that this case simply turns on the conclusion that Florida’s statutory scheme and a purported common law rule render Appellee the legal mother of the child is clearly erroneous and misses the point. “ ‘To say that the test of equal protection [or due process] should be the “legal” rather than the biological relationship is to avoid the issue. For the Equal Protection [and Due Process] Clause[s] necessarily limit[ ] the authority of a State to draw such “legal” lines as it chooses.’ ” Stanley, 405 U.S. at 652, 92 S.Ct. 1208 (quoting Glona v. Am. Guar. & Liab. Ins. Co., 391 U.S. 73, 75-76, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968)).
The dissent asserts that section 742.14 provides a reasonable approach to deciding who is, and who is not, entitled to parental rights given the multitude of claims to such rights made possible by assisted reproductive technology.[9] Furthermore, the *799 dissent argues that such complicated questions of social policy are best decided by the Legislature without interference from the courts. However, the Legislature’s undeniably important role in shaping this state’s policy on the use of assisted reproductive technology does not relieve the courts from the solemn duty to ensure the protection of constitutional rights.
The dissent’s assertion that Appellant’s right to procreate is not implicated in the instant case merely because her child was conceived by in vitro fertilization is a non sequitur. To suggest that procreative rights do not encompass the use of medical technology ignores the fact that the right not to procreate through the use of contraception and the right to terminate a pregnancy necessarily require access to medical technology and assistance. Moreover, the distinction the dissent draws between this case and abortion cases involving the use of one’s omi body, such as in Carey, is unpersuasive. Appellant’s decision to undergo the ova transfer procedure for the purpose of conceiving a child with Appellee did involve Appellant’s use of her own body.
Furthermore, the dissent’s claim that this decision has created a constitutional right to “use a surrogate’s body for nine months to house and nurture one’s genetic child” is difficult to understand, as is the dissent’s suggestion that this opinion would entitle an ova donor to prevent the recipient from obtaining an abortion. It is well established that a woman has a right to terminate her pregnancy without the consent of the genetic father, for example. See Casey, 505 U.S. at 897, 112 S.Ct. 2791 (“In keeping with our rejection of the common-law understanding of a woman’s role within the family, the Court held in [Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) ], that the Constitution does not permit a State to require a married woman to obtain her husband’s consent before undergoing an abortion.”). In addition, the dissent’s argument that this decision opens the door to constitutional protection for bigamy, polygamy, and adult incestuous relationships is simply wrong. This kind of “slippery slope” argument has been made and found to be unpersuasive by the Supreme Court. See Lawrence, 539 U.S. at 589, 123 S.Ct. 2472 (Scalia, J., dissenting) (“State laws against bigamy, same-sex marriage, adult incest, prostitution, masturbation, adultery, fornication, bestiality, and obscenity are ... called into question by today’s decision; the Court makes no effort to cabin the scope of its decision to exclude them from its holding.”).
The dissent also attempts to skirt the constitutional infirmities of the statute by claiming that the constitutional issues were not adequately addressed in the trial court or in this court.[10] We completely reject *800 that argument. Appellant specifically pled in her complaint that section 742.14 is unconstitutional, and it was adequately argued in the trial court and in this court. The dissent’s subjective opinion of what is inadequate simply does not comport with the record in this case and the arguments made by the parties both in the trial court and in this court. We hardly think that counting the number of pages in a brief is a viable standard by which to judge whether an issue has been adequately raised in an appellate court. What was inadequately presented, because it was not presented at all, was any attempt on the part of Appellee to meet her burden of showing that section 742.14 withstands strict scrutiny and is constitutional. Moreover, the record clearly reveals that both in her motion and during the hearing before the trial court, Appellee specifically argued that summary judgment in her favor was appropriate on the constitutional issues and that the facts were not in dispute. The facts are uncontroverted that Appellant contributed her ova to be implanted in the womb of Appellee so both women could have a child to raise as equal parental partners; they did so for several years after the child was born; and Appellant established a parental bond with the child during those years. The trial court held as a matter of law that section 742.14 applies to relinquish Appellant’s her parental rights because she and Appellee do not fit within the statutory definition of a commissioning couple. It is true that Appellant and Appellee do not fit that statutory definition and a remand to the trial court for further proceedings is not going to change that fact or the uncontradicted facts of this case. We also note that the child was taken from Appellant in December 2007 and almost four years have elapsed since Appellant has had contact with her child. We do not believe that it is necessary to remand this case, as the dissent argues, for further proceedings and more appeals when it is clear that application of the statute unconstitutionally deprives Appellant of her parental rights to her child.
We conclude that section 742.14, as interpreted and applied by the trial court and as interpreted by the dissent, is unconstitutional because it deprives Appellant of her constitutional rights to equal protection and privacy.
B. Section 63.042(3) does not Support the Trial Court’s Ruling that Section 742.14 Deprives Appellant of her Parental Rights
Appellee argues that the Legislature disapproves of children being conceived in the manner utilized by her and Appellant and that this disapproval is evident in the provisions of section 63.042(3), Florida Statutes, which prohibits gay or lesbian couples from adopting children in Florida. This statute was a basis for the trial court’s ruling. However, we do not discern any legislative intent that the pro *801 hibitions of that statute apply to deprive either woman of parental rights to a child conceived through the reproductive process employed here, and we can find no prohibition to lesbian women utilizing that process to conceive a child. Moreover, we note that the Third District Court, in Florida Department of Children & Families v. X.X.G., 45 So.3d 79, 92 (Fla. 3d DCA 2010), has recently held that “subsection 63.042(3), Florida Statutes, violates the equal protection provision found in article I, section 2, of the Florida Constitution.” (Footnote omitted).
III. The Informed Consent Form did not Waive Appellant’s Parental Rights
We likewise reject Appellee’s argument that Appellant waived her parental rights when she executed the informed consent document in the reproductive doctor’s office. At the reproductive clinic, Appellant signed a preprinted form that provides in pertinent part:
I, the undersigned, forever hereinafter relinquish any claim to, or jurisdiction over the offspring that might result from this donation and waive any and all rights to future consent, notice, or consultation regarding such donation. I agree that the recipient may regard the donated eggs as her own and any offspring resulting there from as her own children. I understand that the recipient of the eggs, her partner, their successors, offsprings and assigns have agreed to release me from liability for any mental or physical disabilities of the children born as a result of the Donor Oocyte Program and from any legal or financial responsibilities from an established pregnancy or medical costs related to that pregnancy or delivery.
There are significant factors that inform our conclusion that, as Appellant argues, the purported waiver provisions were not intended by either Appellant or Appellee to apply to the conception and birth of their child.
First, the purported waiver provisions clearly state that they only apply to a “donor” who has “relinquished any claim to, or jurisdiction over the offspring that might result from this donation” and who “understands that the recipient may regard the donated eggs as her own and any offspring resulting therefrom as her own children.” Appellant is not a donor because she did not relinquish any claim to the child or understand that it was solely Appellee’s child. As previously discussed, both women agreed to raise any child born with the ova supplied by Appellant as equal parental partners and both women complied with that agreement for several years after the child was born. In the last quoted sentence the form states that the recipient’s partner has “agreed to release me from liability” and it is clear that Appellant was the partner and that she did not agree to release herself from anything. We believe it very revealing that Appellee never attempted to assert this waiver claim until she decided to take the child to Australia and deprive Appellant of any further contact with the child.
Second, Appellant submitted at the summary judgment hearing an affidavit from the doctor who operated the reproductive center that Appellant and Appellee attended and who had personal knowledge of the services provided to both women. The testimony of the doctor reveals that the waiver provisions were simply part of a standard form he has all patients sign and that those provisions were inapplicable to Appellant and Appellee. In the affidavit, the doctor stated that the two women presented themselves as a couple seeking reproductive therapy, represented that they intended to raise a child together, and *802 acted consistently with their desire to raise a child . together. He further explained that the sole purpose of the form was to “inform [Appellant] of the procedures that would be undertaken, the goals of the procedures and the risks related thereto,” and that the form was not tailored to characterize the relationship of either Appellant or Appellee beyond that purpose. Finally, the doctor explained that the quoted provision “is used in situations where the donor is anonymous.”
Third, courts in other jurisdictions have held that similar waiver provisions are inapplicable in cases with very similar facts. For example, in K.M. v. E.G., 37 Cal.4th 130, 33 Cal.Rptr.3d 61, 117 P.3d 673 (2005), two women involved in a lesbian relationship decided to have a child. Ova were removed from one woman so her partner could conceive a child by means of in vitro fertilization. The court held that “when partners in a lesbian relationship decide to produce children in this manner, both the woman who provides her ova and her partner who bears the children are the children’s parents.” Id. at 675. The court examined various statutory provisions and determined that this particular situation was not addressed because the California Legislature had not contemplated a child being conceived in this manner. The court further held that a form containing waiver provisions, which are almost identical to those contained in the form signed by Appellant at the reproductive clinic, did not waive the biological mother’s parental rights to the child. The court held, “A woman who supplies ova to be used to impregnate her lesbian partner, with the understanding that the resulting child will be raised in their joint home, cannot waive her responsibility to support that child. Nor can such a purported waiver effectively cause that woman to relinquish her parental rights.” Id at 682.
Similarly, in In re Adoption of Sebastian, 25 Misc.3d 567, 879 N.Y.S.2d 677 (N.Y.Sur.Ct.2009), which we have previously discussed, two lesbian women were involved in a committed relationship and had actually been married in another country. They decided to have a child by in vitro fertilization. Ova removed from one woman were fertilized and implanted in the other. The procedure proved successful, and a child was born. The court held that the biological mother shared parental rights with the birth mother and that the biological mother did not waive her parental rights by signing a standard ovum donor waiver form at the reproductive clinic.
We conclude based on the particular facts and circumstances of this case that the form Appellant signed did not waive her parental rights to the child. We understand the importance of such waiver forms in the use of assisted reproductive technology and our decision does not extend any farther than the very unusual facts of this case.
IV. A Choice Between Two Mothers is Not Necessary
Finally, Appellee suggests that because she and Appellant have separated, a choice must be made. She posits that, as the birth mother, she should have exclusive parental rights to the child and that Appellant, as the biological mother, should have no rights at all. If we were to accept Appellee’s argument that a choice must be made between the two, perhaps a Solo-monic approach to resolving this dispute would be preferable, but we are neither possessed of the wisdom of Solomon nor are we able to apply his particular methodology under the law as we know it today. Parental rights, which include the love and affection an individual has for his or her child, transcend the relationship between two consenting adults, and we see nothing *803 in this record that makes either Appellant or Appellee an exception that places those rights in one to the exclusion of the other. It is unknown what caused these two women to cross the proverbial line between love and hate, but that is a matter between Appellant and Appellee. Their separation does not dissolve the parental rights of either woman to the child, nor does it dissolve the love and affection either has for the child.
V. Conclusion
We conclude that both Appellant and Appellee have parental rights to the child. Accordingly, we reverse the final summary judgment and remand this case to the trial court to determine, based on the best interests of the child, such issues as custody, visitation, and child support. We certify to the Florida Supreme Court the following question as a matter of great public importance:
Does application of section 742.14 to deprive parental rights to a lesbian woman who provided her ova to her lesbian partner so both women could have a child to raise together as equal parental partners and who did parent the child for several years after its birth render the statute unconstitutional under the Equal Protection and Privacy clauses of the Federal and State Constitutions?
REVERSED and REMANDED.
MONACO, J., concurs and concurs specially, with opinion, in which SAWAYA, J., concurs.
LAWSON, J., dissents, with opinion.

. Appellant included five counts for relief in her Second Amended Petition to Establish Parental Rights and for Declaratory .and Related Relief. In count one, Appellant requested determination of parentage pursuant to chapter 742, Florida Statutes (2009), asking that the court declare her the biological mother of the child, grant her primary residential responsibility, and order the clerk to correct the birth certificate. In count two, she requested determination of parentage and an order granting shared parental responsibility and child support. In count three, Appellant requested declaratory relief that chapter 742, Florida Statutes, "Determination of Parentage," applies equally to determination of maternity in addition to the stated intent of determination of paternity, or in the alternative, that chapter 742 be declared unconstitutional. In count four, she requested that chapter 382, Florida Statutes (2009), The Florida Vital Statistics Act, be declared unconstitutional because it infringed on her right to privacy by preventing recordation of her name on the birth certificate. In count five, she requested that the court declare unconstitutional section 742.14, Florida Statutes (2009), because it violated her equal protection and privacy rights.

. Beagle v. Beagle, 678 So.2d 1271, 1276 (Fla.1996) (holding that article I, section 23 of the Florida Constitution prohibits the state from "intruding] upon the parents’ fundamental right to raise their children except in cases where the child is threatened with harm”); In re Adoption of Baby E.A.W., 658 So.2d 961, 967 (Fla.1995) ("The United States Supreme Court has held that natural parents have a fundamental liberty interest in the care, custody, and management of their children.” (citing Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982))); Grissom v. Dade County, 293 So.2d 59, 62 (Fla.1974) ("The fundamental right to have children either through procreation or adoption is so basic as to be inseparable from the rights to 'enjoy and defend life and liberty, (and) to pursue happiness (quoting Art. I, § 2, Fla. Const. (1968))).

. See Amend. XIV, § 1, U.S. Const.

. See Art. 1, §§ 2, 23, Fla. Const.

. The dissent attempts to buttress its argument that Appellant has no parental rights by citing Wakeman v. Dixon, 921 So.2d 669 (Fla. 1st DCA), review denied, 931 So.2d 902 (Fla.2006). We believe that reliance on Wakeman is misplaced. Wakeman is clearly distinguishable from the instant case because there, one lesbian partner was the birth mother and the partner claiming parental rights was not the biological mother. The court in Wakeman held that the latter was not a "biological parent” and was not a "natural parent.” Here, Appellant, as the biological mother, would fall into both categories under the Wakeman rationale. The dissent's reliance on Lamaritata v. Lucas, 823 So.2d 316 (Fla. 2d DCA), review denied sub nom. D.A.L. v. L.A.L., 835 So.2d 266 (Fla.2002), is likewise misplaced. The court held that a sperm donor has no parental rights. The court further held that the man was a sperm donor, stating, "Sperm donor is not defined in the statute. The contract, however, calls Mr. Lucas 'donor' and indicates that sperm is the only donation required of him. Thus we easily conclude that Mr. Lucas qualifies as a sperm donor.” Id. at 318. Unlike the instant case, the court in Lamaritata concluded that the man was a donor because a contract said he was a donor. Contrary to the assertion in the dissent, we see nothing in Lamaritata that suggests that Mr. Lucas individually executed a consent form similar to the one executed solely by Appellant. The opinion clearly states that " 'D.A.L. (donor) and L.A.L. (recipient) entered into a contract,'” id. at 318 (quoting L.A.L. v. D.A.L., 714 So.2d 595, 596 (Fla. 2d DCA 1998)); a contract is an agreement between two parties, the only agreement between Appellant and Appellee is that they would be equal parental partners to the child, and they both complied widr that agreement for several years after the child was born.

. The dissent also cites a number of law review articles in a footnote as authority for this common law rule. One for example, is Mali-na Coleman, Gestation, Intent, and the Seed: Defining Motherhood in the Era of Assisted Human Reproduction, 17 Cardozo L.Rev. 497 (1996) (hereinafter ‘Defining Motherhood"). This article, like the others, cites no case law to support the proposition that such a common law rale exists. Interestingly, the article *795 relies on a purported ancient Latin maxim that translates to “by gestation the mother is demonstrated.” Id. at 501. However, the author, Professor Coleman, points out that this maxim applied when the functions of genetic contribution and gestation were inextricably bound and the issue of motherhood was not disputable, and she concludes that "[rjeproductive technology has now made the maxim obsolete.” Id. at 502. In fact, Professor Coleman actually argues that when deciding the issue of motherhood in instances where one woman contributes the egg that is implanted in another woman, "intent should be the determinative factor” if rules are in place to prevent overreaching in surrogacy agreements. Id. at 497. We find it very interesting that the author later cites to section 742.15, Florida Statutes, which addresses surrogacy contracts, as such a rule, thus placing Florida squarely in the category of jurisdictions that should decide the issue of motherhood based on the intent of the parties rather than on a presumption of gestational parenthood. See id. at 529. We would also note that recent scholarship indicates that the Latin maxim relied on in this article as evidence of the purported common law rule actually originated in 1983. See Jennifer S. Hendricks, Essentially a Mother, 13 Wm. & Mary J. Women & L. 429, 473 n. 249 (2007) ("Indeed, recent research has shown that the ‘ancient dictum’ ... in fact originated in 1983. Cindy L. Baldassi, Mater est quam gestatio demonstrat: A Cautionary Tale (Univ. of British Columbia Faculty of Law Working Paper Series, 2006), available at http://ssrn. com/abstract=927147 (documenting the coining of the Latin phrase and its mistaken attribution to ancient law, and showing how ‘a maxim designed to elevate gestation to the definition of legal maternity [has been interpreted] as including or even privileging the genetic tie’).”). We do not believe that law review articles written by students and professors establish the common law.

. Although Lehr and the other cases cited, with the exception of Wooley, involved the rights of an unwed genetic father, it would pose a substantial equal protection problem to deny an unwed genetic mother the ability to assert parental rights after she established a parental relationship with her child while allowing an unwed genetic father to do so. Cf. Caban v. Mohammed, 441 U.S. 380, 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (equal protection violation to allow a unwed biological mother to prevent the adoption of her child by withholding her consent while at the same time requiring an unwed biological father to prove that an adoption would not be in the best interest of his child in order to prevent the adoption); Stanley v. Illinois, 405 U.S. 645, 658, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (equal protection violation to require that unwed mothers be shown to be unfit before their children could be taken by the state, but not requiring any showing of unfitness before an unwed father’s parental rights could be terminated); In re Adoption of Sebas *798 tian, 25 Misc.3d 567, 879 N.Y.S.2d 677, 688-89 (N.Y.Sur.Ct.2009) (holding that it was a violation of gender based equal protection for the New York paternity statute to permit "the biological ('putative') father of a child born out of wedlock to establish parental status” while not providing the same statutory mechanism to women who are biological, but not gestational, mothers; stating that "there is no rational, much less compelling, reason to discriminate between male and female genetic parents who seek to use N.Y.'s statutory paternity laws to establish parental rights, as well as corresponding responsibilities, to their children”) (emphasis in original) (footnote omitted); Soos v. Superior Court, 182 Ariz. 470, 897 P.2d 1356, 1361 (1994) (holding that a surrogacy statute violated equal protection because it allowed the genetic father to rebut the presumption that the gestational mother's husband was the legal father but it did not allow the genetic mother to rebut the presumption that the gestational mother was the legal mother).

. The dissent suggests that section 742.14 is not discriminatory in a meaningful way and merely "places broad limits on the right of all citizens to make a parentage claim after donating genetic material to another.” However, the dissent does not explain why it is permissible to interpret section 742.14 to provide an exception that allows an unmarried male who donates his sperm to retain his parental rights when he is an intended parent, *799 while not allowing an unmarried female who donates her ova to retain her parental rights when she is an intended parent. Cf. In re Adoption of Sebastian, 25 Misc.3d 567, 879 N.Y.S.2d 677, 688-89 (N.Y.Sur.Ct.2009); Soos v. Superior Court, 182 Ariz. 470, 897 P.2d 1356, 1361 (1994).

. The dissent does not raise a preservation issue because the constitutional issues were raised below, argued to the trial court, and argued in this appeal. The dissent claims that the issues were not adequately argued to the trial court or to this court and cites Cantor v. Davis, 489 So.2d 18 (Fla.1986), for the proposition that "the constitutionality of a statute’s application to specific facts should normally be considered at the trial level to assure that such issues are not later deemed waived.” Id. at 20. However, we do not believe that Cantor is very helpful to the dissent because the court did consider the constitutionality of a statute applied retroactively, explaining that once an appellate court has jurisdiction, it may at its discretion "consider any issue affecting the case.” Id.; see also Sullivan v. Sapp, 866 So.2d 28, 34 (Fla. *800 2004) ("[W]e also recognize the well-settled principle that 'once an appellate court has jurisdiction it may, if it finds it necessary to do so, consider any item that may affect the case.’”) (quoting Westerheide v. State, 831 So.2d 93, 105 (Fla.2002)); Dralus v. Dralus, 627 So.2d 505, 507-08 (Fla. 2d DCA 1993) (quoting the rule from Cantor that once jurisdiction is acquired, an appellate court has the discretion to consider any issue affecting the case and holding that "in this case, it is not necessary to rely solely on our discretionary authority since the wife raised the general issue of attorney's fees in her cross-appeal. Necessarily entwined in the issue of what percentage of fees the husband should pay is the reasonableness of the fees charged. The husband cannot be required to pay all or part of an unreasonable fee.”). In Wester-heide, the court held that "to the extent that Westerheide's due process claims raise facial challenges to the Ryce Act, we find them appropriate to consider in our review of this matter.” 831 So.2d at 105.