DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

ANGEL GIOVANNI RIVERA and ASHLEY NICHOLE ISABEL BRITO,

Appellants,

v.

JENNIFER SALAS,

Appellee.

No. 2D2022-4066
_____

July 19, 2024

Appeal from the Circuit Court for Hillsborough County; Lindsay M. Alvarez, Judge.

Mark A. Neumaier, Tampa, for Appellant Angel Giovanni Rivera.

Eric R. Maier and Frances E. Martinez of Older Lundy Koch & Martino, Tampa, for Appellant Ashley Nichole Isabel Brito.

J. Robert Angstadt of Tampa Divorce, Tampa, for Appellee.

VILLANTI, Judge.

Angel Giovanni Rivera appeals from an order denying his petition for determination of paternity. We affirm and certify conflict with *Enriquez v. Velazquez*, 350 So. 3d 147 (Fla. 5th DCA 2022).

## **FACTS**

The facts are straightforward. Mr. Rivera donated his sperm to lesbian couple Ashley Brito and Jennifer Salas. Ms. Brito was successfully impregnated using Mr. Rivera's sperm via artificial

insemination at home. Two weeks after learning that the artificial insemination had been successful, Ms. Brito and Ms. Salas married. When the child was born, the birth certificate listed Ms. Brito and Ms. Salas as the child's parents. A little more than a year after the child was born, Ms. Brito and Ms. Salas separated. Ms. Brito moved out of the marital home and took the child with her. Mr. Rivera subsequently petitioned the trial court for a determination of paternity. The trial court denied the petition, concluding that Mr. Rivera did not have standing to petition for paternity based on its interpretation of section 742.14, Florida Statutes (2020).

## **DISCUSSION**

Mr. Rivera argues that the trial court erroneously applied section 742.14 when it concluded that Mr. Rivera did not have standing to petition for paternity. He concedes that the trial court correctly followed *A.A.B. v. B.O.C.*, 112 So. 3d 761 (Fla. 2d DCA 2013), a case that applied section 742.14 to an almost identical set of facts, but he argues that this court should recede from *A.A.B.* in light of the Fifth District's interpretation of *D.M.T. v. T.M.H.*, 129 So. 3d 320 (Fla. 2013), in *Enriquez*. We disagree.

Chapter 742, which was originally called "The Bastardy Act," *see* ch. 57-267 § 1, Laws of Fla., was concerned with the ability of mothers of children born out of wedlock to obtain support from the biological father. *See Brown v. Bray*, 300 So. 2d 668, 669 (Fla. 1974) ("Section 742.011 provides for exclusive relief to the mother in Bastardy proceedings.") As time went on, several sections of chapter 742 were repealed, some were rewritten, new sections were added, and the courts began to refer to chapter 742 and its subsections as "the paternity statute" or "the determination of paternity statutes." *See, e.g., Knauer v. Barnett,* 360 So.

2

2d 399, 403 (Fla. 1978) (referring to sections 742.011, 742.021, 742.031, and 742.091 as "the determination of paternity statutes").

In its current form, chapter 742, now entitled "Determination of Parentage," provides for the determination of paternity or maternity and related issues such as jurisdiction, adoption, and subsequent marriage of the parents and contains several sections dealing with evolving technical and social issues such as artificial insemination and donation of sperm, eggs, and preembryos.  *See* § 742.11 (establishing irrebuttable presumption that child born within wedlock conceived by artificial or in vitro insemination or by means of donated eggs or preembryos is the child of the husband and wife); § 742.12 (use of scientific testing to determine paternity); § 742.13 (definitions); § 742.14 (relinquishment of maternal or paternal rights by the donor of sperm, eggs, or preembryos); § 742.15 (contract required for surrogacy);  § 742.16 (petitions for affirmation of parental status); and 742.17 (disposition of eggs, sperm, and preembryos).

The instant case is primarily concerned with section 742.14,[1] which provides, in pertinent part: "The donor of any egg, sperm, or preembryo, other than the commissioning couple[2] or a father who has

_____

[1] Section 742.14 has not been amended since it was created in 1993, except once to update the section number of the preplanned adoption agreement statute.

[2] "Commissioning couple" is defined as "the intended mother and father of a child who will be conceived by means of assisted reproductive technology using the eggs or sperm of at least one of the intended parents."  § 742.13(2) (emphasis added).  "Assisted reproductive technology" is defined as "procreative procedures which involve the laboratory handling of human eggs or preembryos."  § 742.13(1) (emphasis added).

3

executed a preplanned adoption agreement under s. 63.213, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children." The statute's meaning is clear on its face.[3] Donors of sperm, eggs, or preembryos have no standing to assert parental rights with respect to children conceived and born as a result of their donation. There are two exceptions: (1) members of a commissioning couple and (2) fathers who have executed a preplanned adoption agreement. Thus, <u>donors</u> in either of these exception categories are not subject to the mandatory relinquishment of their parental rights.

This straightforward reading of the statute was confirmed in *D.M.T.* *D.M.T.* came to the supreme court following the Fifth District's determination in *T.M.H. v. D.M.T.*, 79 So. 3d 787 (Fla. 5th DCA 2011), that section 742.14 was unconstitutional as applied. The case involved a lesbian couple in a long-term committed relationship, who agreed to conceive and raise a child together. T.M.H. donated her own ovum, which was extracted in a clinical setting, fertilized with donor sperm, and implanted into D.M.T.[4] D.M.T. successfully carried the child to term. *Id.* at 788-89. As a result (to state the obvious), the biological mother and the birth mother were different women.

The couple's relationship eventually soured. After a short separation during which they initially shared custody and the child's expenses, D.M.T. absconded with the child to Australia. *T.M.H.*, 79 So.

---

[3] "Our 'sole function' in interpreting statutes is to apply to the law as we find it." *Enriquez*, 350 So. 3d at 155 (Sasso, J., dissenting) (quoting *Alachua County v. Watson*, 333 So. 3d 162, 169 (Fla. 2022)). "This is our obligation even if we believe the proper interpretation leads to a harsh outcome." *Id.* (citing *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 134 (2015)).

[4] Thus meeting the definition of "assisted reproductive technology."

3d at 780.  T.M.H. found her and served her with the lawsuit that became the Fifth District's case.  *Id.*  The trial court reluctantly found in favor of D.M.T. because the way the statute was (and still is) written, same-sex couples cannot meet the definition of "commissioning couple" because the statute defines commissioning couple, in part, as "the intended mother and father."  Accordingly, the trial court held that although T.M.H. was the donor, she was not protected by the "commissioning couple" exception and, pursuant to the statute, had relinquished her parental rights.  *T.M.H.*, 79 So. 3d at 789-90.  The Fifth District reversed, holding that section 742.14 was unconstitutional as applied: "Interpretation and application of this statute by the trial court to deny Appellant parental rights to her child cannot withstand strict scrutiny and violates Appellant's constitutional rights to equal protection and privacy under the United States and Florida Constitutions."  79 So. 3d at 793 (footnotes omitted).

Curiously, however, the Fifth District also held that T.M.H. was not a "donor" as used in section 742.14 because she was also the child's parent.[5]  *Id.* at 792.  The supreme court rejected the Fifth District's holding that T.M.H. did not meet the definition of donor, 129 So. 3d at 333; however, it approved the Fifth District's conclusion that the statute was unconstitutional as applied, *id.* at 341.  In short, because T.M.H. did not qualify as a member of a "commissioning couple" because the term is limited to "the intended mother and father," "that application of section 742.14 forces the automatic statutory relinquishment of T.M.H.'s 'right to

---

[5] We are perplexed by this holding.  T.M.H. indisputably donated her egg, and the statute clearly anticipates that the person seeking to take advantage of either exception is both the donor and one of the prospective parents.  Read any other way, the exceptions would be meaningless.

form a parental relationship with her child and to continue to participate in raising the child as a parent as she had done for several years after the child was born.' " *D.M.T.*, 129 So. 3d at 340 (quoting *T.M.H.*, 79 So. 3d at 796).[6] This result is untenable:

> It would indeed be anomalous if, under Florida law, an unwed biological father would have more constitutionally protected rights to parent a child after a one[-]night stand than an unwed biological mother who, with a committed partner and as part of a loving relationship, planned for the birth of a child and remains committed to supporting and raising her own daughter.

*Id.* at 339.

The circumstances that led to the supreme court's decision in *D.M.T.* are not remotely similar to the circumstances in the instant case. Absent the unfortunate wording of the definition of "commissioning couple," T.M.H. would be both a donor and a member of the commissioning couple, giving her the ability to assert her parental rights under the statute. Importantly, *D.M.T.* also involved the use of "assisted reproductive technology," i.e., the laboratory handling of a human egg. Here, Mr. Rivera is obviously the donor, but he cannot qualify under either of the statute's exceptions, so the definitions of "commissioning couple" and "assisted reproductive technology" are not relevant here.

Section 742.14 was written to address this precise scenario. Simply put, a sperm donor who is not a member of the commissioning couple and has not executed a preplanned adoption agreement waives any right to interfere with the child's upbringing. A plain reading of the

---

[6] Had "commissioning couple" been defined as "the intended parents" instead of "the intended mother and father," this issue never would have arisen.

statute compels this conclusion, and the supreme court's rationale in *D.M.T.* supports it:

> We recognize the important role section 742.14 plays in protecting couples seeking to use assisted reproductive technology to conceive a child from parental rights claims brought by typical third-party providers of the genetic material used in assisted reproductive technology, as well as the State's corresponding interest in furthering that objective. This case, however, does not implicate those concerns.

129 So. 3d at 340. Unlike in *D.M.T.*, the instant case <u>does</u> implicate those concerns, and there is no constitutional impediment to the application of section 742.14 under these facts.

## CONTROLLING PRECEDENT

In *A.A.B. v. B.O.C.*, 112 So. 3d 761 (Fla. 2d DCA 2013), this court considered an almost identical set of facts as those presented in the instant case. B.O.C. was the sperm donor for the "do-it-yourself" artificial insemination of A.A.B., who was in a long-term lesbian relationship with S.C. A.A.B. and S.C. intended to raise the child as their own. A few years after the child was born, A.A.B. and S.C.'s relationship deteriorated, and they separated. B.O.C. subsequently filed suit to establish paternity and visitation with the child. *Id.* at 762.

The trial court held that because the couple had used an at-home "do-it-yourself" insemination procedure as opposed to doing it in a clinical or laboratory setting, section 742.14 did not apply. *Id.* Based on this finding, the trial court held that B.O.C. was entitled to petition for paternity. *Id.* This court reversed:

> A plain reading of section 742.14 reveals that the donor of any sperm shall relinquish all paternal rights and obligations with respect to the resulting children. The only exceptions in the statute are when (1) "a commissioning couple" employs "assisted reproductive technology" or (2) a father has executed

7

> a preplanned adoption agreement under the adoption statutes.

*Id.* at 762-63. Because B.O.C., like Mr. Rivera in the instant case, did not qualify under either exception, he automatically relinquished his parental rights under the statute.

Importantly, nothing in section 742.14 requires that the birth mother be inseminated using "assisted reproductive technology" for its conditions to apply. This conclusion is commanded by the definition of "assisted reproductive technology" itself, which says nothing about the manipulation of sperm except as an adjunct to the laboratory handling of eggs, likely because artificial insemination can be done at home using common household implements. Thus, artificial insemination, in and of itself, is, by definition, not "assisted reproductive technology."

### CERTIFICATION OF CONFLICT

The Fifth District recently came to a different conclusion in *Enriquez v. Velazquez*, 350 So. 3d 147 (Fla. 5th DCA 2022). In that case, James Enriquez and Ashley Velazquez, who were not married and were not in a romantic relationship with each other, "decided to have a child together." *Id.* at 148. The child was not conceived the old-fashioned way; instead, Velazquez was artificially inseminated at home with Enriquez's sperm. *Id.* At some point in time following the child's birth, Enriquez petitioned to establish paternity and timesharing. Velazquez did not oppose the petition.

Despite the parents'[7] apparent general agreement on the important issues, the trial court sua sponte concluded that section 742.14 barred

---

[7] Based on the facts described in the opinion, it appears to be without question that Enriquez and Velazquez were the biological parents of the child and had conducted themselves as the child's parents since it was conceived.

8

Enriquez's claim of paternity because the child was conceived at home by means of artificial insemination. Since the "commissioning couple" exception requires that the child be conceived by means of assisted reproductive technology, the trial court concluded that Enriquez, who was indisputably the donor, could not rely on the "commissioning couple" exception to assert his paternity claim. *Id.* at 150. The Fifth District affirmed the trial court's finding "that the parties' 'at-home, do-it-yourself method of artificial insemination' did not involve the 'laboratory handling of human eggs or preembryos.' " *Id.* Despite this, the Fifth District held that "section 742.14 applies to paternity actions only when the child was born as a result of assisted reproductive technology." *Id.* at 150-51 (emphasis added). In reaching this conclusion, the Fifth District appears to have relied heavily on the supreme court's repeated references to section 742.14 as "the assisted reproductive technology statute" in *D.M.T.*

> [T]he supreme court referred to section 742.14 as the "assisted reproductive technology statute" eleven times[] and . . . explicitly held that in enacting section 742.14, "the Legislature articulated a policy of treating all individuals who provide eggs, sperm, or preembryos *as part of assisted reproductive technology* as 'donor[s]' bound by the terms of the statute."

*Enriquez*, 350 So. 3d at 151 (footnote omitted) (quoting *D.M.T.*, 129 So. 3d at 333).

It is here where we part company with our sister court. As Judge Sasso said in her cogent dissent, the majority's interpretation of section 742.14 changes "[t]he donor of any egg, sperm, or preembryo" into "[t]he donor who provides as a part of assisted reproductive technology any egg, sperm, or preembryo." *Id.* at 155 (Sasso, J., dissenting). We also agree with Judge Sasso that the supreme court's use of the phrase "the

9

assisted reproductive technology statute" when discussing the legislature's articulated reasons for creating the statute "is better read as an observation made by way of background", that the frequent use of the phrase conjointly with the section number reflects the particular facts of *D.M.T.* and the legal conclusion that the statute was unconstitutional as applied in that case, and that the use of the phrase within the statement, "the Legislature articulated a policy of treating all individuals who provide eggs, sperm, or preembryos as part of assisted reproductive technology as 'donor[s]' bound by the terms of the statute" is dicta, not a holding. *See id.* at 155-56 (Sasso, J., dissenting).

## CONCLUSION

We reiterate our holding in *A.A.B.*: The do-it-yourself manner in which the artificial insemination was accomplished does not alter the fact that Mr. Rivera was a sperm donor under section 742.14, and section 742.14 does not require artificial insemination to be performed in a clinical or laboratory setting to apply. Accordingly, we affirm the order denying Mr. Rivera's petition for paternity and certify conflict with *Enriquez* insofar as it holds that "section 742.14 applies to paternity actions only when the child was born as a result of assisted reproductive technology." 350 So. 3d at 151.

Affirmed; conflict certified.


CASANUEVA and MORRIS, JJ., Concur.

_____

Opinion subject to revision prior to official publication.

10