921 So.2d 669 (2006)
Mary L. WAKEMAN, Appellant,
v.
Dené B. DIXON, Appellee.
No. 1D05-0103.
District Court of Appeal of Florida, First District.
January 24, 2006.
Rehearing Denied February 28, 2006.
Paula L. Walborsky and Mary A. Kane of Walborsky and Kane, P.A., Tallahassee, for Appellant.
Kristin Adamson of Novey, Mendelson & Adamson, Tallahassee, for Appellee.
PER CURIAM.
Mary L. Wakeman appeals a final order dismissing with prejudice her amended complaint seeking to enforce several agreements with Dené B. Dixon, appellee, under which appellant argued she was granted certain parental rights and responsibilities, including visitation, with respect to two minor children born to Dixon. We agree with the trial court that, under Florida law, absent evidence of detriment to the child, courts have no authority to grant custody or to compel visitation by a person who is not a natural parent and that agreements providing for visitation by a non-parent are unenforceable. Accordingly, we affirm.
The following facts are based on the factual allegations in the amended complaint and documents attached thereto, which we are required to accept as true. See Siegle v. Progressive Consumers Ins. Co., 819 So.2d 732, 734 (Fla.2002); Aguila v. Hilton, Inc., 878 So.2d 392, 395 (Fla. 1st DCA 2004).
*670 In 1989 Wakeman and Dixon began to live together. In November 1997, the parties jointly entered into a sperm donation agreement with the sperm donor. In this agreement, both Wakeman and Dixon are each described as "recipient," "mother" and "co-parent." By this agreement, the sperm donor relinquished parental rights and agrees that the "recipients" and "co-parents" will be responsible for all decisions regarding a child conceived through sperm donation. Among the other provisions, in the sperm donation agreement, Wakeman and Dixon agreed that in the event
the Mother of any Child[ren] born through artificial insemination procedure is deceased or legally disabled and consequently no longer able to care for the Child[ren], it would be in the best interest of the Child[ren] to remain with the Co-Parent. As to any Child[ren] born to Dené B. Dixon, Mary L. Wakeman is the Co-Parent. As to any Child[ren] born to Mary L. Wakeman, Dené B. Dixon is the Co-Parent. It is contemplated by the parties that the Co-Parents will become "psychological parents" to the Child[ren], and the Child[ren] shall reside with the Mother and Co-Parent from the time of birth.
As a result of the sperm donation, Dixon became pregnant. After the birth of the child in May 1999, Dixon and Wakeman entered into another agreement in which each party acknowledged that the decision to conceive the child was a "joint decision" which was based on the commitment of each to parent to "jointly parent the child." In this agreement, referred to by the parties as the co-parenting agreement, Wakeman agreed to contribute to the financial support of the child and both parties indicated their intent to "equally share in providing the child" with the necessary support until majority. Both parties also agreed that, while Wakeman is not a biological parent, she is
a de facto parent who has participated in all phases of pre-natal care, and who plans to provide [the child] with a stable environment and psychological parenting relationship. Mary's relationship with [the child] should be protected and promoted to preserve the strong emotional tie that will develop between them.
The co-parenting agreement also provides that, in the event the parties no longer reside together, they will continue to provide for the child in the manner described in the agreement and that each party will facilitate a close relationship with the other and will continue to raise the child in a joint manner.
In addition, Dixon executed a pre-need designation of guardianship naming Wakeman as the guardian of the child and a medical and dental consent form whereby Wakeman was granted authority to make decisions regarding the child's medical and dental health. Dixon also designated Wakeman as her attorney in fact to manage the affairs relating to the child and as the health care surrogate for the child.
Pursuant to an amended sperm donation agreement, Dixon became pregnant with a second child who was born in December 2001. After the birth, another co-parenting agreement, identical to the one previously executed save for the reference to the child's name and date of birth, was executed by Wakeman and Dixon regarding the second child. In addition, a pre-need guardianship was established for the second child naming Wakeman as guardian and medical/dental consent and health surrogacy forms were executed authorizing Wakeman to make all medical and dental decisions regarding the second child. In February 2004, Wakeman and Dixon executed an affidavit of domestic partnership *671 to allow Dixon and the two minor children to receive coverage under Wakeman's health insurance.
In May 2004, Wakeman and Dixon ceased residing together, and Dixon relocated to Brooksville, Florida with the two children. Wakeman alleges that she has not been in personal contact with the children since May 25, 2004, and has not spoken to them since a telephone conversation on June 3, 2004.
Wakeman filed a complaint against Dixon for breach of contract, breach of fiduciary duty, residency and child support, and declaratory judgment. In brief, Wakeman was seeking a declaration of parental rights to the two children born to Dixon. Dixon moved to dismiss the complaint arguing that Wakeman had no enforceable legal rights regarding the children. Following a hearing, the trial court granted the motion to dismiss. In the order, the trial court noted that Wakeman and the guardian ad litem, who appeared as next friend for the minors, made a compelling argument that it is in the best interests of the children to enforce the co-parenting agreements. The trial court ruled, however, that under Florida statutory and case law, it possessed no authority to compel visitation between a child and a person who is not a parent. Further, the court ruled that Florida law does not recognize a claim for specific performance of a contract for visitation with an unrelated third party.
Because we are considering a question of law in determining whether the allegations of a complaint state a cause of action, we review an order granting a motion to dismiss for failure to state a cause of action by the de novo standard of review. Aguila, 878 So.2d at 395.
On appeal, Wakeman argues that, under the agreements between the parties, she has been granted the status of a parent for the two minor children born to Dixon and that the trial court erred in not extending the protections of chapter 61, Florida Statutes, to her and the two children. We find that the appellant's arguments lack support in Florida law.
The Florida Supreme Court has held that, under the privacy provision in the Florida Constitution,[1] a third party, even a grandparent, cannot be granted by statute the right to visitation with minor children, because, absent evidence of a demonstrable harm to the child, such a grant unconstitutionally interferes with a natural parent's privacy right to rear his or her child. See Beagle v. Beagle, 678 So.2d 1271 (Fla.1996)(holding that the state may not properly intervene in parental decision-making absent significant harm to the child threatened by or resulting from those decisions); Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998)(holding that, because no compelling state interest underlies grandparent visitation statute, such a statute is unconstitutional as an impermissible government interference in a parent's fundamental right to rear a child); Richardson v. Richardson, 766 So.2d 1036, 1039-40 (Fla.2000)(holding unconstitutional a statute authorizing courts to recognize grandparents as having the same standing as parents for evaluating what custody arrangements are in the best interest of the child where the child actually resided with the grandparents in a stable relationship). In adopting the explicit constitutional right of privacy in article I, section 23, Floridians "opted for more protection from governmental intrusion" than was afforded *672 under the federal constitution. Beagle, 678 So.2d at 1275 (quoting Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla.1985)). Thus, "[t]he state constitutional right to privacy is much broader in scope, embraces more privacy interests, and extends more protection to those interests than its federal counterpart." Von Eiff, 720 So.2d at 514. In addition to the constitution barrier, the court has recognized that, in granting custody or visitation rights to non-parents based on the best interest of the child:
[T]here is an inherent problem with utilizing a best interest analysis as the basis for government interference in the private lives of a family, rather than requiring a showing of demonstrable harm to the child. It permits the State to substitute its own views regarding how a child should be raised for those of the parent. It involves the judiciary in second-guessing parental decisions. It allows a court to impose its own notion of the children's best interests over the shared opinion of these parents, stripping them of their right to control in parenting decisions.
Id. at 516 (citations and quotations omitted). For similar reasons, Florida courts also have held that agreements granting visitation rights to a non-parent are unenforceable. See Lamaritata v. Lucas, 823 So.2d 316 (Fla. 2d DCA 2002); Taylor v. Kennedy, 649 So.2d 270 (Fla. 5th DCA 1994).
In Taylor, Robert Affourit, who lived with a woman and her child for several years, sought visitation with a child who was not his biological child and to whose mother he was never married. After the break-up between Affourit and the mother, the mother sought various injunctions against him. As part of an agreement dissolving the injunctions, the mother agreed to visitation by telephone contact between Affourit and her child. The mother later refused to abide by the agreement, and Affourit sought to enforce the agreement in court. Visitation was ordered by the trial court, and the mother sought relief by way of a petition for a writ of prohibition. The Fifth District granted the writ, explaining:
Affourit has no right to claim court-ordered visitation as a "psychological parent," and the court lacks the inherent authority to award it. Swain v. Swain, 567 So.2d 1058 (Fla. 5th DCA 1990); see also Moore v. Trevino, 612 So.2d 604 (Fla. 4th DCA 1992); Wills v. Wills, 399 So.2d 1130, 1132 (Fla. 4th DCA 1981) (Moore, J. dissenting) (and cases cited therein). Moreover, Florida courts do not recognize a claim for specific performance of a contract for visitation in favor of a non-parent. Nor does Florida recognize a child's right to petition a Florida court to order his or her parent to permit visitation with third parties, especially where the "next friend" assertedly acting for the child is the third party.
649 So.2d at 271-72 (footnote omitted).
In Lamaritata, a sperm donor and a recipient biological mother entered into a visitation agreement after the donor filed suit seeking visitation after the birth of the children at issue. The issue continued to be litigated and, on appeal, the Second District held that a sperm donor has no right to visitation and that any agreement granting visitation rights was unenforceable. The court explained:
[T]he sperm donor is a nonparent, a statutory stranger to the children. Even though the parties entered into... stipulations, purportedly to give visitation rights to this nonparent, we conclude that agreement is not enforceable. There are numerous Florida cases holding that nonparents are not entitled to *673 visitation rights. See, e.g., O'Dell v. O'Dell, 629 So.2d 891, 891 (Fla. 2d DCA 1993)(reversing visitation for a divorced man and his stepson, noting that "[t]his court has repeatedly reversed orders giving visitation rights to nonparents"); Kazmierazak v. Query, 736 So.2d 106, 106 (Fla. 4th DCA 1999)(holding that "psychological parent" was not entitled to custody or visitation); Meeks v. Garner, 598 So.2d 261 (Fla. 1st DCA 1992); cf. Lonon v. Ferrell, 739 So.2d 650, 652 (Fla. 2d DCA 1999)(holding that biological grandparents were "statutory strangers" to children following their adoption by stepfather; statute authorizing grandparent visitation violated parent's constitutional right to privacy). Contracts purporting to grant visitation rights to nonparents are unenforceable. Taylor v. Kennedy, 649 So.2d 270, 271-72 (Fla. 5th DCA 1994)("Florida courts do not recognize a claim for specific performance of a contract for visitation in favor of a non-parent.").
823 So.2d at 319.
Our holding in the case on appeal is controlled by our decision in Music v. Rachford, 654 So.2d 1234 (Fla. 1st DCA 1995). In Music, we held that chapter 61, Florida Statutes, does not allow non-parents to seek custody or visitation. By its explicit provisions, section 61.13, Florida Statutes (2004), concerns only the parents' custody, support and visitation. In Music, we affirmed an order dismissing with prejudice a complaint in which the plaintiff, Music, sought shared parental responsibility and visitation with a child conceived by her lesbian former partner. Music alleged facts similar to those alleged in the instant case: the parties established a domestic partnership, decided to conceive a child together and utilized artificial insemination, went to pre-natal classes together, and jointly reared the child in a single household for three years before the relationship ended. When the relationship ended, the biological parent denied her former partner all access to the child. In affirming, this court explained:
We reject appellant's argument that she is a de facto parent and as such, entitled to the rights of a parent under chapter 61, Florida Statutes, and AFFIRM on the controlling authority of Meeks v. Garner, 598 So.2d 261 (Fla. 1st DCA 1992)("[v]isitation rights are, with regard to a non-parent, statutory, and the court has no inherent authority to award visitation"; the courts have "no authority to compel visitation between a child and one who is neither a parent, grandparent, nor great-grandparent").
654 So.2d at 1235.[2]
Wakeman argues that Music is distinguishable for the case before us, since the parties there did not enter into the agreements entered into by Wakeman and Dixon. Because under Florida law those agreements are unenforceable to the extent they purport to grant parental rights to Wakeman, we find that this is a distinction without a difference.
For the reasons explained above, we affirm the order on appeal.
AFFIRMED.
ERVIN and BARFIELD, JJ., concur; VAN NORTWICK, J., specially concurs with written opinion.
*674 VAN NORTWICK, J., specially concurring.
As well explained in the majority opinion, Florida law does not provide a remedy in the case before us, even if the relief Wakeman seeks would be in the best interest of the minor children here. The number of children in Florida raised in so-called non-traditional households,[3] such as the Wakeman-Dixon household, is increasing. I am concerned that, when those households dissolve, Florida law ignores the needs of those children. I write to urge the Florida Legislature to address the needs of the children born into or raised in these non-traditional households when a break-up occurs.
The 2000 United States Census "enumerated 105.5 million households in the United States, of which the majority (52 percent) were maintained by married couples (54.5 million)." Tavia Simmons and Martin O'Connell, Married-Couple and Unmarried-Partner Households: 2000 1, Census 2000 Special Reports (U.S. Census Bur. Feb. 2003). Census 2000 also noted "a reflection of changing lifestyles," id., with the "enumeration of 5.5 million couples who were living together but who were not married, up from 3.2 million in 1990." Id. In the vast majority of the unmarried-partner households, the partners were of the opposite sex (4.9 million households, or 89 percent); but in 11 percent of the unmarried-partner households the partners were of the same sex. Id.
As represented by the case before us, many unmarried-partner households include minor children. Census 2000 determined that 43.1 percent of opposite sex unmarried-partner households included children under the age of 18 years, while 22.3 percent of male partner households and 34.3 percent of female partner households included minor children. Id. at 9. In Florida, the percentages of such partner households that included minor children are only slightly lower than the national percentages. Id.
In addition, assisted reproduction[4] is widely used in this country and has provided the opportunity, among other things, for unmarried women to have children without a relationship with a male.[5] As commentators have noted, assisted reproduction also creates the possibility of the fragmentation of parentage. Professor *675 John Lawrence Hill observes that "[w]e now live in an era where a child may have as many as five different `parents.' These include a sperm donor, an egg donor, a surrogate or gestational host, and two nonbiologically related individuals who intend to raise the child." John Lawrence Hill, What Does It Mean To Be a "Parent?" The Claims of Biology as the Basis for Parental Rights, 66 N.Y.U. L.Rev. 353, 355 (1991). Despite the constitutional protection of both procreation and child rearing, see Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)(procreation); Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)(child rearing), as this case evidences, Florida law does not protect the interests of the child produced by assisted reproduction where the child is born into a non-traditional family. It is undisputed in the research that the dissolution of a household with children can have adverse effects on those children. A person
develops a parent-child relationship with the child through day-to-day interaction, companionship, and emotional caring for the child. This relationship fulfills the child's psychological needs for a parent, in addition to providing for the child's physical necessities of daily living. Once this bond forms, breaking up the relationship, psychologists believe, will have serious and harmful effects on the child's emotional development.
Suzette M. Haynie, Biological Parents v. Third Parties: Whose Right to Child Custody is Constitutionally Protected?, 20 Ga. L.Rev. 705, 745 n. 3 (1986).[6] Florida courts have recognized the
proposition that a child between the age of six months and three years establishes an attachment, or bonding, to a primary caretaker; that this bonding is essential to the wholesome emotional development of the child; that to deprive a child of the primary caretaker during this period has a destructive effect on the child's intellectual, physical and psycho-social development....
Agudo v. Agudo, 411 So.2d 249, 250 (Fla. 3d DCA 1982). The dissolution of a non-traditional household can have damaging consequences on a child which are identical to the consequences of a dissolution of a traditional marriage-based relationship. See generally, Kyle V. Velte, Towards Constitutional Recognition of the Lesbian-Parented Family, 26 N.Y.U. Rev. L. & Soc. Change 245 (2000/2001). Yet the child in the non-traditional family in Florida is not protected either by statutory rights or by the ability of courts to secure the best interests of the child when the household dissolves. Even though one might lament the growth of the number of non-traditional households with children,[7] *676 lamentations do not address the reality facing the child.
I recognize that, in Florida, a natural parent's privacy rights under article I, section 23 of Florida's Constitution protect the parent from unwarranted governmental interference unless it is shown that custody by the parent is detrimental to the child. See In re Guardianship of D.A.McW., 460 So.2d 368, 369-370 (Fla. 1984); Von Eiff v. Azicri, 720 So.2d 510, 514 (Fla.1998); Richardson v. Richardson, 766 So.2d 1036, 1039 (Fla.2000). The Supreme Court has also recognized, however, that
if circumstances present themselves that question the safety of the minor child, any concerned party may seek the initiation of proceedings to protect the well-being of the child. See Schilling v. Wood, 532 So.2d 12 (Fla. 4th DCA 1988)(recognizing third party's right to initiate dependency proceedings under chapter 39).
Richardson, 766 So.2d at 1043. When a non-traditional household breaks up, it should not require a dependency proceeding to protect the well-being of the child.
NOTES
[1] Article I, section 23 of the Florida Constitution provides, in pertinent part, that "[e]very natural person has the right to be let alone and free from governmental intrusion into his private life."
[2] Florida law does not recognize same sex marriages, section 741.212(1), Florida Statutes (2005), and defines the term "spouse" as applying to a "legal union between one man and one woman as husband and wife." § 741.212(3), Fla. Stat. (2005). In addition, Florida law prohibits adoptions by homosexuals. § 63.042(3), Fla. Stat. (2005). Neither party raised these statutes in their arguments, and we do not address them here.
[3] The terms "traditional family" or "natural family" refer to the traditional nuclear family with a husband/father, wife/mother, and their children. See Martha Albertson Fineman, Our Sacred Institution: The Ideal of the Family in American Law and Society, 1993 Utah L.Rev. 387, 389 n. 8.
[4] Methods of assisted reproduction technology include (1) intrauterine insemination; (2) donation of eggs; (3) donation of embryos; (4) in-vitro fertilization and transfer of embryos; and (5) intracytoplasmic sperm injection. New techniques are constantly being developed in this highly unregulated area. See Richard F. Storrow, Parenthood by Pure Intention: Assistant Reproduction and the Functional Approach to Parentage, 53 Hastings L.J. 597 (2002).
[5] From 1996 to 2002, the number of live-birth deliveries in the U.S. resulting from assisted reproduction technology increased 120 percent, from 20,840 to 45,751. See U.S. Dep't of Health and Human Srvs-Ctrs for Disease Control & Prevention, 2002 Assisted Reproductive Technology (ART) Report: Section 5-ART Trends, (1996-2202)(http://www.cdc.gov /ART/ART02). It is unclear how many of those babies are being raised by single parents or by same-sex couples, but it appears from research of published sources that the individuals seeking assisted reproduction services are generally females who intend to be single mothers, but men are also known to make arrangements to acquire a child through the use of assisted reproductive assisted technology. See Camille S. Williams, Planned Parent Deprivation: Not in the Best Interests of the Child, 4 Whittier J. Child and Fam. Adv. 375, 406 n. 1 (2004).
[6] See J. Goldstein, A. Freud, and A. Solnit, Beyond the Best Interests of the Child (1973) at 12-13, who explain:

Unlike adults, children have no psychological conceptions of relationship by blood-tie until quite late in their development. For the biological parents, the facts of having engendered, borne, or given birth to a child produce an understandable sense of preparedness for proprietorship and possessionness. These considerations carry no weight with children who are emotionally unaware of the events leading to their births. What registers in their minds are the day-to-day interchanges with the adults who take care of them and who, on the strength of these, become the parent figures to whom they are attached.
[7] It has been observed:

States have responded to dramatic changes in the "realities of the American family" and dramatic advances in reproductive technologies by expanding the notions of "parents" and "family." Both of these developments, and the legal trends they have ushered in, undermine traditional conceptions of the family and parenthood and the legal doctrines based on those conceptions.
Responding to changes in the nature of the American family, state courts and legislatures have endeavored to recognize as parents in effect those not recognized as parents at law. In so doing, many states have rejected traditional assumptions about the nuclear family and the sanctity of parental status. In contrast, states for the most part have failed to respond comprehensively to reproductive technologies that call into question not only the very definition of parenthood, but also the assumptions about parenthood that underlie the law's treatment of adoption. Expanded recognition of functional parents, coupled with the absence of regulation in the face of reproductive technologies, represents a dramatic departure from the law's traditional commitment to the nuclear family and the sanctity of legal parenthood.
Note on Developments in the LawThe Law of Marriage and Family, Changing Realities of Parenthood: The Law's Response to the Evolving American Family and Emerging Reproductive Technologies, 116 Harv. L.Rev.2052, 2073-4 (2003).