POLSTON, C.J.,
dissenting.
Unlike the majority, I do not believe that sections 742.14 and 742.13(2), Florida Statutes, violate T.M.H.’s constitutional rights to due process, privacy, and equal protection. Instead, contract law, common law, Florida statutory law, and the United States and Florida Constitutions all provide that T.M.H. does not have parental rights with respect to the child born to D.M.T. Therefore, I respectfully dissent.
I refer to the parties in this case using the birth mother’s initials, D.M.T., and the egg donor’s initials, T.M.H. The majority refers to T.M.H. as the biological mother, but the term might appear to answer the very question addressed by this Court, namely whether T.M.H. is a legal parent. Furthermore, the terms the majority uses to distinguish the parties (birth mother and biological mother) are confusing because “both the genetic and gestational roles in bringing this child into the world are ‘biological’ processes.” T.M.H. v. D.M.T., 79 So.3d 787, 807 (Fla. 5th DCA 2011) (Lawson, J., dissenting).
I. Background
D.M.T. and T.M.H. were involved in relationship from 1995 until 2006. In January 2004, D.M.T. gave birth to a child who was conceived through assisted reproductive technology. T.M.H. had donated the egg. At the time of donation, T.M.H. signed two informed consent forms relinquishing any rights or claims to her eggs and to any resulting child.
Both women lived together with the child until May 2006, at which time the child began living solely with D.M.T. Initially after their separation, T.M.H. provided support payments and continued her relationship with the child. However, D.M.T. and T.M.H.’s relationship further deteriorated, and D.M.T. terminated T.M.H.’s contact with the child in December 2007.
In April 2008, T.M.H. filed a petition to establish parental rights and for declaratory relief. She later filed an amended petition and a second amended petition. In her second amended petition, T.M.H. requested the following relief: (1) an adjudication of parentage pursuant to chapter 742, Florida Statutes; (2) a declaration that chapter 742 provides a mechanism for determining maternity or, alternatively, if it just provides a mechanism for determining paternity, a declaration that it violates her constitutional rights to equal protection and due process under the Florida and United States Constitutions; (3) a declaration that chapter 382, Florida Statutes, regarding birth certificates, unconstitutionally infringes her rights to due process and equal protection under the Florida and United States Constitutions; and (4) a declaration that section 742.14 violates her right to privacy under the Florida Constitution and her right to equal protection under the Florida and United States Constitutions. T.M.H.’s petition acknowledged that she had signed an informed consent form waiving her rights to any offspring created, but she argued that the form was inconsistent with her and D.M.T.’s true intent.
After first moving to quash service of process and moving to dismiss, D.M.T. answered T.M.H’s complaint and moved for summary judgment. D.M.T. conceded that she and T.M.H. had raised the child together for a period of time; however, D.M.T. did not concede that at the time of T.M.H.’s egg donation the two had intended to co-parent any resulting child. In fact, her answer expressly denied that allegation. Instead, D.M.T. argued that summary judgment was proper, despite this *349 disputed factual issue, because T.M.H. lacked parental rights to the child born to D.M.T. as a matter of law. In addition, D.M.T. asserted multiple affirmative defenses: (1) T.M.H. voluntarily executed a waiver of all her rights and claims; (2) section 742.14 provides that a donor of any biological material relinquishes all rights; and (3) the United States and Florida Constitutions provide D.M.T. with an absolute right to privacy to parent the child without any interference from T.M.H.
During the summary judgment hearing, T.M.H. did not elaborate on the cursory constitutional claims she set forth in her petition. Instead, T.M.H.’s counsel obliquely stated that D.M.T. was asking the trial court “to interpret these statutes and to erase the blood lineage that exists between T.M.H. and the child” and that “to apply [Lamaritata v. Lucas, 823 So.2d 316 (Fla. 2d DCA 2002),] to the instant situation would in my opinion be unconstitutional because [T.M.H.] is the biological parent and because this is really the only way that they could have a child.” Then, after referencing Florida’s gestational surrogacy statute (which is not at issue in this case), T.M.H.’s counsel vaguely mentioned equal protection in connection with a constitutional right to procreate:
Florida law clearly recognizes that most everybody has a constitutional right to procreate and raise a child. It doesn’t distinguish between same-sex couples or heterosexual couples. It just says that everybody has the right to procreate.
Now, if a same-sex couple wants to have a child, they can [sic] adopt a child under the existing State of Florida law. But there is nothing that prevents them from going to a fertility specialist and asking that a child, not be engineered but a procedure be undertaken so that a child can be born. If you consider every single one of those situations, as one in which one parent is a donor and the other is not, and you then interpret the statute to say that the donor loses all rights to that child when the parties break up and the birth parent decides that they don’t want to be involved in the situation anymore, then what you are doing is you’re depriving one of those parties of equal protection under the law because you have a situation where people have a constitutional right to procreate.
After the hearing, the trial court granted summary judgment in favor of D.M.T. The trial court’s order explained that “[t]he law does not recognize the rights of a biological mother versus a birth mother.” Additionally, the trial court stated that “[s]ame sex partners do not meet the definition of ‘commissioning couples’ as defined in [c]hapter 742,” and that “[a]n agreement or contract between the parties, and/or previous course of conduct, does not create any rights in [T.M.H.] to the minor child.” Therefore, the trial court ruled that, “under the current state of the law, the Court cannot find any rights that [T.M.H.] would have with regard to the minor child herein.”
On appeal to the Fifth District Court of Appeal, T.M.H. contended that D.M.T.’s statutory right to parent is not a superior interest over T.M.H.’s fundamental right to parent. And “[t]o apply Florida Statutes in such a manner as to deprive [T.M.H.] of those fundamental rights deprives her of equal protection under the law and the right to due process.” Moreover, T.M.H. claimed that, despite the existence of the informed consent form waiving her parental rights, sufficient conflict in the record exists to merit an evidentiary hearing. D.M.T. responded that T.M.H., as an egg donor, statutorily relinquished any claim to the resulting child and that *350 T.M.H. also voluntarily signed a contractual waiver of parental rights at the time of donation. Furthermore, D.M.T. argued that she has a fundamental right to the love and companionship of her child under both the United States and Florida Constitutions.
The Fifth District reversed the trial court, holding that section 742.14 is inapplicable because T.M.H. did not fall within the statutory definition of “donor” since she and D.M.T. intended to co-parent the resulting child. T.M.H., 79 So.3d at 792. The Fifth District further held that the trial court’s interpretation and application of section 742.14 infringed upon T.M.H.’s parental rights and her right to procreate in violation of both the United States and Florida Constitutions. Id. at 793-94, 798. Finally, the Fifth District concluded that T.M.H.’s contractual waiver was ineffective because T.M.H. was not a donor but was instead D.M.T.’s partner. Id. at 801-02.
Based on the above procedural history, two things are abundantly clear. First, the constitutional claims that the majority analyzes are not actually before this Court because they were not properly raised and preserved below. Although in her complaint T.M.H. alleged that section 742.14 violated her rights to equal protection under the United States and Florida Constitutions and her right to privacy under the Florida Constitution, “the record does not reflect that [T.M.H.] ever advanced any coherent legal theory, analysis or argument in support of these constitutional claims.” Id. at 815 (Lawson, J., dissenting). Additionally, despite the majority’s discussion of the federal and Florida substantive due process clauses, T.M.H.’s complaint never alleged a violation of her rights under those clauses. Accordingly, the constitutional challenges to sections 742.14 and 742.13(2) that the majority discusses were not preserved, and this Court has no ability to reverse the trial court’s ruling in favor of D.M.T. on that basis. See Tillman v. State, 471 So.2d 32, 35 (Fla.1985) (“In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved.”).
Second, contrary to the majority’s (and the Fifth District’s) repeated statements that it is undisputed that T.M.H. and D.M.T. intended to co-parent any child resulting from T.M.H.’s egg donation, the record indicates that the parties’ intentions are very much in dispute in this case. As explained above, D.M.T. never conceded that she and T.M.H. had jointly agreed to co-parent, and the trial court decided this case on a motion for summary judgment without an evidentiary hearing. In fact, T.M.H. argued before the trial court as well as the Fifth District that a factual dispute exists as to her intentions regarding-her egg donation and that an evidentia-ry hearing should be required to resolve the factual dispute. Therefore, the majority misstates the undisputed nature of the parties’ intentions in this case, and any of the majority’s reasoning based upon that misstatement is inappropriate.
II. Contractual Waiver
As explained above, T.M.H. signed at the time of her egg donation two waivers of all claims and rights she might have regarding any resulting child. Specifically, the informed consent donor form that T.M.H. signed at the time she donated her eggs includes the following language:
I, the undersigned, [T.M.H.,] forever hereafter relinquish any claims to jurisdiction over the offspring that might result from this donation and waive any and all rights to future consent, notice, or consultation regarding the donation. *351 I agree that the recipient may regard the donated eggs as her own and any offspring resulted there from as her own children.
In addition to this informed consent donor form, T.M.H. also signed an “Informed Consent Oocyte Recipient” form on the line reserved for the recipient’s partner. And, very similar to the donor form, the recipient form provides as follows:
I/We understand that the egg donor has relinquished any claim to, or jurisdiction over the offspring that might result from this donation and waive any and all rights to future consent, notice, or consultation regarding such donation. The donor understands that the recipient may regard the donated eggs as her own and any offspring resulting there from as her own children.
Therefore, T.M.H. signed two contracts that expressly waived any rights she might have with respect to any child resulting from her egg donation.
A person may waive fully vested, fundamental parental rights by completing a form. See, e.g., § 39.806(l)(a), Fla. Stat. (providing that grounds for the termination of parental rights may be established “[w]hen the parent or parents have voluntarily executed a written surrender of the child and consented to the entry of an order giving custody of the child to the department for subsequent adoption”); Matter of Adoption of Doe, 543 So.2d 741, 744 (Fla.1989) (“Absent a finding of fraud, duress, or undue influence, a natural parent’s consent to an adoption is valid and irrevocable upon execution of the written consent.”) (quoting Matter of Adoption of Doe, 524 So.2d 1037, 1041 (Fla. 5th DCA 1988)); Hall v. Hall, 672 So.2d 60, 62 (Fla. 1st DCA 1996) (“Under Florida law, the birth mother’s written consent to the wife’s adoption of the child is valid and irrevocable.”). In fact, a genetic father’s execution of a written waiver of his parental rights was found to be enforceable as freely and voluntarily executed even though it was presented to him without his counsel present. In the Interest of D.M.W., 623 So.2d 634, 635-36 (Fla. 4th DCA 1993). Further, as recognized by this Court in Chames v. DeMayo, 972 So.2d 850, 860-61 (Fla.2007), individuals may waive various constitutional rights, including the right to counsel, the right to remain silent, and the right to a jury.
If one can waive fully vested parental rights and various constitutional rights by signing a written form, an egg donor can certainly waive any potential interest in a possible future child by completing a form. Consequently, I would give effect to the plain language of the two forms that T.M.H. signed and conclude that T.M.H. contractually waived any claim of parental rights. See State Farm Mut. Auto. Ins. Co. v. Menendez, 70 So.3d 566, 569 (Fla.2011) (“[W]e are bound by the plain meaning of the contract’s text.”).
The majority dismisses the contracts that T.M.H. signed, stating that an exact copy of one of the two forms, specifically the donor form, is not present in our record. However, T.M.H. readily acknowledged in her complaint and elsewhere that she signed a waiver as part of her informed consent as an egg donor. Furthermore, the relevant language from the donor form was quoted in the Fifth District’s opinion and exists in our record as well because it was read by D.M.T.’s attorney during the hearing on the motion for summary judgment and is included in the transcript of that proceeding. Additionally, exact copies of the “Informed Consent Oo-cyte Recipient” form are repeatedly present in our record.
The majority also states that it would ignore any contractual waivers signed by T.M.H. anyway, even if an exact copy of *352 the donor form was in our record. In reaching this conclusion, the majority relies on one case from New York and one from California. The majority fails to cite any Florida law for its proposition, either cases involving the enforcement of contracts in genei’al or cases involving the contractual waiver of rights in circumstances similar to this one. Notably, the Second District Court of Appeal’s decision in Lamaritata, 823 So.2d 316, is very persuasively on point.
In Lamaritata, a donor and recipient “entered into a contract whereby the donor would provide sperm to [the] recipient with the expectation that she would become pregnant through artificial insemination and deliver offspring.” 823 So.2d at 318 (quoting L.A.L. v. D.A.L., 714 So.2d 595, 596 (Fla. 2d DCA 1998), an earlier decision involving the same parties). Further, their “agreement provided that if childbirth resulted, the donor would have no parental rights and obligations.” Id. The Second District held that “[b]oth the contract between the parties and the Florida statute controlling these arrangements provide that there are no parental rights or responsibilities resulting to the donor of sperm.” Id. at 319 (citing § 742.14, Fla. Stat.). As a result, “the sperm donor is a nonparent, a statutory sti*anger to the children.” Id. The donor’s status as a nonpar-ent continued to be true, even though the donor and recipient “entered into subsequent stipulations, purportedly to give visitation rights to this [donor.]” Id. The Second District explained that the subsequent visitation rights agreement between the parties was not enforceable because “[t]here are numerous Florida cases holding that nonparents are not entitled to visitation rights.” Id.
In this case, like the donor in Lamari-tata, T.M.H. signed a contract at the time of donation waiving any claims or rights to any potential child. And similar to the parties in Lamaritata, T.M.H. and D.M.T. agreed at some point to co-parent the child as evidenced by T.M.H. participating in parenting decisions for a period of time after the child’s birth, although the parenting agreement in this case appears to have been oral and not formally executed. However, just as the Second District concluded in Lamaritata, I would hold that the donor in this case is a nonparent by operation of the waivers of rights she signed (as well as by operation of section 742.14). Because T.M.H. is not a legal parent, any agreement, oral or otherwise, that may have existed between the parties for T.M.H. to co-parent is unenforceable under Florida law. See Wakeman v. Dixon, 921 So.2d 669 (Fla. 1st DCA 2006) (holding that written agreement between same-sex couple providing parental rights to non-birth mother was unenforceable even though the non-birth mother had provided support and had been a de facto parent for years); Kazmierazak v. Query, 736 So.2d 106 (Fla. 4th DCA 1999) (concluding that “psychological parent” was not entitled to visitation or custody); Taylor v. Kennedy, 649 So.2d 270 (Fla. 5th DCA 1994) (holding that visitation and support agreement between man who formerly lived with mother of a child was unenforceable because “Florida courts do not recognize a claim for specific performance of a contract for visitation in favor of a non-parent”); O’Dell v. O’Dell, 629 So.2d 891 (Fla. 2d DCA 1993) (reversing visitation for a divorced man and former stepson and explaining that the Second District “has repeatedly reversed orders giving visitation rights to nonparents”).
Accordingly, I would give effect to the plain language of the two waivers that T.M.H. signed at the time of donation, two contracts that expressly state that T.M.H. “relinquish[es] any claims to jurisdiction over the offspring that might result” and *353 that D.M.T. “may regard the donated eggs as her own and any offspring resulted there from as her own children.”
III. Florida’s Assisted Reproductive Technology Statute
Similar to the contractual waivers that T.M.H. signed, section 742.14, entitled “Donation of eggs, sperm, or preembryos,” provides the following:
The donor of any egg, sperm, or preem-bryo, other than the commissioning couple or a father who has executed a preplanned adoption agreement under s. 63.212, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children. Only reasonable compensation directly related to the donation of eggs, sperm, and preembryos shall be permitted.
Section 742.13(2), Florida Statutes, defines “Commissioning couple” as “the intended mother and father of a child who will be conceived by means of assisted reproductive technology using the eggs or sperm of at least one of the intended parents.”
The purpose of this statute is to define the rights of parties who use assisted reproductive technology to conceive and to thereby provide certainty and stability for parents and children. “When construing a statute, this Court attempts to give effect to the Legislature’s intent, looking first to the actual language used in the statute and its plain meaning.” Trinidad v. Fla. Peninsula Ins. Co., 121 So.3d 433, 439 (Fla.2013).
Here, the plain language of section 742.14 applies to T.M.H. as “[t]he donor of any egg.” As the majority accurately explains, “[t]he plain language of section 742.14 does not provide for the subjective intentions of someone in T.M.H.’s position to be taken into consideration in determining whether he or she is a ‘donor’ under the terms of the statute.” Majority op. at 333. And T.M.H. does not fall within the definition of a “commissioning couple” delineated in section 742.13(2) as she cannot be considered “the intended mother and father.” Therefore, pursuant to the plain language of section 742.14, T.M.H. has no “rights and obligations with respect to the donation or the resulting child[.]” T.M.H. “is a nonparent, a statutory stranger to the childf.]” Lamaritata, 823 So.2d at 319. The operation of this statute is in addition to and duplicative of T.M.H.’s contractual waiver of any rights or claims to the child.
Accordingly, under both Florida contract law and Florida statutory law, the trial court properly granted summary judgment in favor of D.M.T.
IV. D.M.T.’s Constitutional Rights
D.M.T. has consistently argued throughout this case that her constitutional rights as the child’s legal parent bar T.M.H’s claims for visitation and parental rights, and I agree.
“Both the United States and Florida Constitutions protect individuals from arbitrary and unreasonable governmental interference with a person’s right to life, liberty, and property.” State v. Robinson, 873 So.2d 1205, 1212 (Fla.2004) (citing U.S. Const, amends. V, XIV; art. I, § 9, Fla. Const.).
“[A]s the natural and legal mother of the child, D.M.T. enjoys protection under both the United States Constitution and the Florida Constitution against interference with her parental rights.” T.M.H., 79 So.3d at 807 (Lawson, J., dissenting). In fact, D.M.T.’s “liberty interest at issue in this case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court.” Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). And “ft]he interest of a parent in the *354 upbringing of his or her children has been acknowledged by this Court as a fundamental liberty interest under the Florida right to privacy.” Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 206 (Fla.2007) (Lewis, C.J., concurring in result only) (citing Beagle v. Beagle, 678 So.2d 1271, 1275 (Fla.1996)).
Providing T.M.H. access to visitation and other incidents of a parental relationship over D.M.T.’s objection would violate D.M.T.’s due process and privacy rights as the child’s legal parent. See Wakeman, 921 So.2d at 671 (holding that co-parenting agreement between same-sex couple was unenforceable and explaining that a nonlegal parent “cannot be granted by statute the right to visitation with minor children, because, absent evidence of a demonstrable harm to the child, such a grant unconstitutionally interferes with a natural parent’s privacy right to rear his or her child”); see also Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998) (holding that grandparent visitation statute unconstitutionally interfered with the legal parent’s fundamental right to rear a child).
V. The Majority’s Substantive Due Process & Privacy Analysis
The majority skips any analysis of D.M.T.’s constitutional rights as the legal parent. Instead, the majority concludes as a matter of substantive due process and privacy that, because T.M.H. at some point established a relationship with the child, the promotion of stability and certainty in families employing assisted reproductive technology is an insufficient state interest to support the termination of that relationship. The majority’s conclusion is based upon its argument that T.M.H. has a fundamental interest in her relationship with the child that is protected by the due process clauses of the United States and Florida Constitutions and the privacy clause of the Florida Constitution.
But contrary to the majority’s description of the asserted interest as the elimination of an already established parental relationship, section 742.14 operates at the time of donation to eliminate any interests or obligations a sperm donor or egg donor may have with regard to a future, potential child. At the time of the donation of biological material, any interest in a potential parental relationship would have to be deemed an inchoate interest and not even possibly a fundamental interest protected by the due process and privacy clauses as there is indisputably no child or parental relationship with a child at that point. See Adoption of Doe, 543 So.2d at 748 (explaining that “it is the assumption of the parental responsibilities which is of constitutional significance”); G.F.C. v. S.G., 686 So.2d 1382, 1385-86 (Fla. 5th DCA 1997) (holding that a genetic father who has not acted as a parent does not have any protected liberty interest in the child under the Florida or federal constitutions); § 63.022(l)(e), Fla. Stat. (“An unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood[J”).
Moreover, the majority’s analysis ignores a vital aspect of substantive due process jurisprudence. The United States Supreme Court has recognized the temptation for members of a court to improperly constitutionalize their own preferences and thereby impose them upon the rest of the citizenry in perpetuity and, therefore, has “insisted not merely that the interest denominated as a ‘liberty1 be ‘fundamental’ (a concept that, in isolation, is hard to objectify), but also that it be an interest traditionally protected by our society.” Michael H. v. Gerald D., 491 U.S. 110, 122, 109 S.Ct. *355 2333, 105 L.Ed.2d 91 (1989) (footnote omitted). In other words, due process only affords protections to rights “so rooted in the traditions and conscience of our people as to be ranked as fundamental.” Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). “This insistence that the asserted liberty interest be rooted in history and tradition is evident, as elsewhere, in [United States Supreme Court] cases according constitutional protection to certain parental rights.” Michael H., 491 U.S. at 123, 109 S.Ct. 2333; see also Lehr v. Robertson, 463 U.S. 248, 256, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (“It is self-evident that [the connections between parents and children] are sufficiently vital to merit constitutional protection in appropriate cases. In deciding whether this is such a case, however, we must consider the broad framework that has traditionally been used to resolve the legal problems arising from the parent-child relationship.”) (emphasis added).
Without discussing, as required by Snyder, whether the asserted interest is rooted in history and tradition, the majority concludes that T.M.H. has a fundamental right to parent the child in this case by reading Lehr as establishing that a fundamental right is created when genetic parenthood is combined with the establishment of a parental relationship. However, a plurality of the United States Supreme Court has emphatically stated that this reading of Lehr (as well as this reading of its other parental rights cases) “distorts the rationale of those cases.” Michael H., 491 U.S. at 123, 109 S.Ct. 2333. According to the United States Supreme Court, Lehr and its other parental rights cases “rest not upon such isolated factors but upon the historic respect — indeed, sanctity would not be too strong a .term — traditionally accorded to the relationships that develop within the unitary family.” Id. (footnote omitted).
Therefore, based upon the United States Supreme Court’s interpretation of its own precedent, the substantive due process issue in the present case really comes down to whether relationships like the one between T.M.H. and the child born to D.M.T. “ha[ve] been treated as a protected family unit under the historic practices of our society, or whether on any other basis [they have] been accorded special protection.” Id. at 124, 109 S.Ct. 2333. Of course, it is impossible to conclude that such relationships have been treated in this manner. In fact, our history indicates that quite the opposite is true as our society has historically protected the legal rights of birth mothers and the traditional family.
Historically, the birth mother was the only legal mother of a child. As a New York court has explained, “[a]t common law, parentage derived from two events, a child’s birth to its ‘mother,’ and the mother’s marriage to a man. Children born out-of-wedlock had only one legal parent, their birth mother.” In re Matter of Sebastian, 25 Misc.3d 567, 879 N.Y.S.2d 677, 679 (N.Y.Sur.2009); see also Gossett v. Ullendorff, 114 Fla. 159, 154 So. 177, 181 (1934) (explaining that a “wife is not permitted to deny the parentage of children born during wedlock” because “maternity is never uncertain”). Later, legislatures provided for paternity proceedings to legally establish the parental rights and obligations of unwed, genetic fathers in certain circumstances as well as for adoption. See, e.g., § 742.10, Fla. Stat; ch. 63, Fla. Stat. But “[Florida] law, like nature itself, makes no provision for dual [mother]hood,” either historically or presently. Michael H., 491 U.S. at 118, 109 S.Ct. 2333; cf. art. I, § 27, Fla. Const, (defining marriage in Florida as “the legal union of *356 only one man and one woman”).[10] For example, section 39.01(49), Florida Statutes, defines “[pjarent” as “a woman who gives birth to a child and a man whose consent to the adoption of the child would be required under s. 63.062(1),” and section 63.032(12), Florida Statutes, similarly defines “[pjarent” as “a woman who gives birth to a child and who is not a gestational surrogate as defined in s. 742.13 or a man whose consent to the adoption of the child would be required under s. 63.062(1).” See also § 382.002(11), Fla. Stat. (“ ‘Live birth’ means the complete expulsion or extraction of a product of human conception from its mother[.]”); § 382.013(l)(g), Fla. Stat. (requiring the listing of the child’s birth mother on the birth certificate as a legal parent).
Accordingly, “the claim that a State must recognize multiple [motherjhood has no support in the history or traditions of this country.” Michael H., 491 U.S. at 131, 109 S.Ct. 2333. And because it lacks this support, any substantive due process claim raised by T.M.H. (if one, in fact, had been properly raised and preserved) must fail. See Snyder, 291 U.S. at 105, 54 S.Ct. 330 (explaining that due process only affords protections to liberty interests “so rooted in the traditions and conscience of our people as to be ranked as fundamental”).
But not only does the majority’s analysis skip the vital question of whether the alleged right is “so rooted in the traditions and conscience of our people as to be ranked as fundamental,”[11] it also suffers from the problem of having no seeming or logical end point. Does the majority’s analysis now mean that section 742.14 is unconstitutional as applied to all sperm and egg donors since they are also denied the opportunity to develop parental relationships with children resulting from their biological material? Or perhaps the majority would limit its holding to those sperm and egg donors who may later develop relationships with resulting children despite the operation of the statute? However, does this mean that a child could have a constitutional right to two mothers and a father (or two fathers), perhaps where a married, heterosexual couple agrees to and then subsequently raises a child with the egg donor, an egg donor who is in a committed relationship with a man other than the genetic father? Or perhaps this new constitutional right to employ assisted reproductive technology without the relinquishment of any donor rights and obligations only applies to those in same-sex relationships? Additionally, does this newly created constitutional right now override all waivers of parental rights, including voluntary waivers leading to adoption?
Based upon the above, it is clear that the majority’s substantive due process analysis is flawed and lacks an obvious stopping point even though the majority repeatedly states that its holding only extends to the particular circumstances of this case.
*357 VI. Equal Protection
The majority also concludes that sections 742.14 and 742.18(2) violate the equal protection clauses of the United States and Florida Constitutions by “exempting heterosexual couples, but not same-sex couples, from the automatic relinquishment of parental rights when seeking the assistance of reproductive technology to conceive a child with the intent to become the child’s parents.” Majority op. at 841. It reaches this conclusion by applying a rational basis analysis and assuming that there is no legitimate state purpose behind these statutes. However, the Legislature had a legitimate state purpose in enacting these statutes.
“Under a ‘rational basis’ standard of review a court should inquire only whether it is conceivable that the regulatory classification bears some rational relationship to a legitimate state purpose!:]”
The burden is upon the party challenging the statute or regulation to show that there is no conceivable factual predicate which would rationally support the classification under attack. Where the challenging party fails to meet this difficult burden, the statute or regulation must be sustained.
Fla. High Sch. Activities Ass’n v. Thomas, 434 So.2d 306, 308 (Fla.1983); see also Westerheide v. State, 831 So.2d 93, 112 (Fla.2002). It is not the judiciary’s task under the rational basis standard “to determine whether the legislation achieves its intended goal in the best manner possible, but only whether the goal is legitimate and the means to achieve it are rationally related to the goal.” Loxahatchee River Envtl. Control Dist. v. Sch. Bd. of Palm Beach Cnty., 496 So.2d 930, 938 (Fla. 4th DCA 1986). “Some inequality or imprecision will not render a statute invalid.” Acton v. Ft. Lauderdale Hosp., 440 So.2d 1282, 1284 (Fla.1983).
The rationale underlying sections 742.14 and 742.13(2) is the promotion of stability, certainty, and permanence in families employing assisted reproductive technology. And the State has a legitimate interest in regulating assisted reproductive technology and its social and economic effects. See § 63.022(l)(a), Fla. Stat. (“The state has a compelling interest in providing stable and permanent homes for adoptive children!.]”); In re T.W., 551 So.2d 1186, 1194 (Fla.1989) (“[W]here parental rights over a minor child are concerned, society has recognized additional state interests — protection of the immature minor and preservation of the family unit.”); Griffin v. State, 396 So.2d 152, 155 (Fla.1981) (“The well-being of children is a subject within the state’s constitutional power to regulate.”). The statutes are rationally related to this legitimate interest since allowing claims of parentage by egg and sperm donors could disrupt the certainty, stability, and permanence that generally proves beneficial to families employing assisted reproductive technology, including the constitutionally protected parental rights of legal birth mothers “to make decisions concerning the care, custody, and control of their children.” Troxel, 530 U.S. at 66, 120 S.Ct. 2054. Accordingly, because it pursues a legitimate purpose by rational means, Florida’s decision to treat T.M.H. differently from a commissioning couple cannot be deemed a denial of equal protection.
Furthermore, as Judge Lawson aptly noted,
the statute in question here is not directed just at men or women, heterosexuals or homosexuals, or any other narrow class. It places broad limits on the right of all citizens to make a parentage claim after donating genetic material to another. And ... the statute does not bar [T.M.H.] (or any women, irrespective of sexual preference) from using assisted *358 reproductive technology to conceive, bear and give birth to a child of her own, using her own body. This appears, at least on its face, to be a rational way to address this difficult social policy issue, irrespective of whether it reflects a policy choice that the majority or I would prefer.
T.M.H., 79 So.3d at 823 (Lawson, J., dissenting). Simply put, T.M.H. did not have to choose this way. The statute does not prohibit T.M.H. from engaging in any sexual activity, using assisted reproductive technology to pass along her genes to a child gestated by another, or parenting a child that she personally gave birth to or legally adopted. The statute does not stand in the way of T.M.H. having children.
VIL Conclusion
As explained above, T.M.H. contractually waived all of her rights and claims to any resulting child at the time of her egg donation. Furthermore, the plain language of Florida’s assisted reproductive technology statute provides that T.M.H. has no parental rights or obligations with respect to the child born to D.M.T. And, contrary to the majority’s decision otherwise, Florida’s assisted reproductive technology statute does not violate T.M.H.’s rights to due process, privacy, and equal protection under the United States and Florida Constitutions.
Accordingly, I respectfully dissent.
LEWIS and CANADY, JJ., concur.

. Florida’s constitutional definition of marriage remains valid. It and this case are not affected by the United States Supreme Court’s recent decisions in United States v. Windsor, - U.S. -, 133 S.Ct. 2675, 2693, 186 L.Ed.2d 808 (2013) (holding that the provision of the Defense of Marriage Act that defines marriage for federal law purposes "violates basic due process and equal protection principles” as it deviates "from the usual tradition of recognizing and accepting state definitions of marriage”), and Hollingsworth v. Perry, - U.S. -, 133 S.Ct. 2652, 2659, 186 L.Ed.2d 768 (2013) (holding that the proponents of California’s constitutional provision defining marriage did not have standing to appeal district court’s order declaring that definition unconstitutional).

. Snyder, 291 U.S. at 105, 54 S.Ct. 330.