# Third District Court of Appeal

## State of Florida

Opinion filed August 16, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-1855
Lower Tribunal No. 15-4466
_____

## Vivian De Los Milagros Castellat,
Appellant,

vs.

## Gisela Lissette Pereira,
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Amy Steele Donner, Judge.

The Carlyle Appellate Law Firm and Christopher V. Carlyle (The Villages), for appellant.

The Perez Matos Law Firm and Cecilia Perez-Matos (Delray Beach), for appellee.

Before LOGUE, SCALES and LUCK, JJ.

PER CURIAM.

Affirmed. See Russell v. Pasik, 178 So. 3d 55 (Fla. 2d DCA 2015);

Wakeman v. Dixon, 921 So. 2d 669 (Fla. 1st DCA 2006).

SCALES and LUCK, JJ., concur.

Vivian De Los Milagros Castellat v. Gisela Lissette Pereira
Case No. 3D16-1855

LOGUE, J., concurring.

This case involves an area of law – regarding how advances in reproductive technology impact the definition of the modern family – which is struggling to catch up with and reflect the rapid changes taking place in society. In this case, a same-sex couple arranged to have a child together. When the couple separated, the birth mother blocked all contact between the child and the former partner. The former partner filed a petition in the lower court to establish her parental rights regarding the child, including visitation. The case presents the issue of whether the birth mother's constitutional right to privacy protects her decision to sever the child's ties with her former partner when the former partner is not the biological or legal parent of the child.

## I.  BACKGROUND

In reviewing a motion to dismiss, the truth of the allegations are assumed. See Xavier v. Leviev Boymelgreen Marquis Developers, LLC, 117 So. 3d 773, 775 (Fla. 3d DCA 2012) ("In ruling on a motion to dismiss, all well-pled facts in the complaint are accepted as true . . . ."). The Appellant, Vivian de los Milagros Castellat, filed the petition in the court below seeking to establish parental rights. For ten years she was the domestic partner of the Appellee, Gisela Lissette Pereira, the birth mother of the child who was the subject of the petition. During that time,

3

the parties presented themselves as a married couple, but never actually wed.[1]  Ms. De los Milagros Castellat, whom we will refer to as the "former partner," and the birth mother utilized assisted reproductive technology to have a child.  They agreed Pereira, the Appellee, would be the birth mother.

In 2009, the birth mother gave birth to twins: a boy and a girl who were born prematurely.  The boy survived only two days. The girl lived but continued to have special needs. Both children were given the former partner's surname, but the birth mother alone was listed as the mother on the birth certificates.

The parties raised the child together for approximately four years. The parties and the child celebrated holidays together. Both the birth mother and the former partner took the child to her many doctor appointments, which included physical therapy, speech therapy, and occupational therapy.  For the duration of their time together with the child, the parties lived in a home that was jointly owned by the birth mother and the former partner.  The parties twice consulted

---

1.  During the time of the parties' relationship, same-sex couples could not marry in Florida. As the trial court remarked, however, a marriage in one of the states recognizing same-sex marriage would likely have been entitled to full faith and credit in Florida. Art. IV, §1, U. S. Const. See Brandon-Thomas v. Brandon-Thomas, 163 So. 3d 644 (Fla. 2d DCA 2015) (holding, in the context of a divorce proceeding, that the Full Faith and Credit Clause required Florida to recognize a same-sex marriage legally obtained in another state even though Florida law at the time did not recognize same-sex marriages performed in Florida). The marital status of the parties does not play a role in our analysis of the facts presented in this case.

with an adoption attorney regarding the process for the former partner to adopt the child, but no adoption took place.

In late 2013, the parties separated. Following the separation, the birth mother severed all ties between the child and the former partner. The birth mother also changed the child's surname to her own, without notice to the former partner. The former partner, seeking to continue her relationship with the child, filed the petition which contained six counts: Count I sought a determination of parentage pursuant to Chapter 743, Florida Statutes; Count II sought a determination of parentage pursuant to common law implied contract; Count III sought a determination of parentage pursuant to equitable estoppel; Count IV sought declaratory relief that the appellant had standing pursuant to Chapter 42; Count V sought the establishment of visitation consistent with principles of common law, implied contract and equitable estoppel; and Count VI sought a determination of parentage pursuant to the due process clause of the United States and the Florida Constitution.

The birth mother filed a motion to dismiss the petition for lack of subject matter jurisdiction and for failure to state a cause of action. Following a hearing, the trial court entered its final order dismissing the petition with prejudice. This appeal followed.

## II. ANALYSIS

At one time, the common law of Florida empowered judges to award child visitation against the will of the birth, biological, or legal parent when the judge found that visitation was in the best interest of the child because a non-parent qualified as a "psychological parent." See, e.g., Cone v. Cone, 62 So. 2d 907 (Fla. 1953) (upholding award of child custody to grandmother against claim of the biological father); Wills v. Wills, 399 So. 2d 1130, 1131 (Fla. 4th DCA 1981) (holding that a psychological parent could qualify for the parental status of the biological and legal father: "It seems to us that if an adequate record can be made demonstrating that it is in the child's best interest that such visitation be authorized the trial judge's discretion in the matter is sufficiently broad to allow him to authorize visitation with a non-parent.").

But these cases lost all efficacy once courts began taking into consideration Florida's right to privacy: "Although these earlier cases recognized the concept of a psychological parent and awarded custody or visitation to the psychological parent based upon the best interests of the child, they did so without addressing the issue of the biological or adoptive parent's fundamental or constitutionally protected right of privacy . . . ." Kazmierazak v. Query, 736 So. 2d 106, 109 (Fla. 4th DCA 1999) (declining to follow Wills because "no mention is made of the father's fundamental and constitutionally protected right of privacy"). See Richardson v. Richardson, 766 So. 2d 1036, 1043 n.9 (Fla. 2000) (noting "to the

6

extent [Cone, 62 So. 2d at 907] granted custody of the minor children to the grandmother absent a showing of detrimental harm to the children if custody were to be awarded to the children's natural father, [Cone] has been impliedly overruled by this Court's [privacy] decisions.")

The Florida Constitution's express right to privacy states: "Every natural person has the right to be let alone and free from governmental intrusion into the person's private life, except as provided herein." Art. I, § 23, Fla. Const. "In enacting this freestanding constitutional provision, the citizens of Florida opted for more protection from governmental intrusion than that afforded under our federal constitution. The state constitutional right to privacy is much broader in scope, embraces more privacy interests, and extends more protection to those interests than its federal counterpart." Von Eiff v. Azicri, 720 So. 2d 510, 514 (Fla. 1998) (citations and quotations omitted).

Florida's constitutional right to privacy recognizes the zone of autonomy around a nuclear family into which a judge, legislator, or official, no matter how well intentioned, simply cannot go. This zone protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." D.M.T. v. T.M.H., 129 So. 3d 320, 336 (Fla. 2013) (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)). The only exception occurs if one of the members of the family is at risk of significant harm. In this regard, the Florida

7

Supreme Court has held that "[n]either the legislature nor the courts may properly intervene in parental decisionmaking absent significant harm to the child threatened by or resulting from those decisions." Von Eiff, 720 So. 2d at 514. Under these principles, it is violation of a parent's right to privacy for the legislature to confer on non-parents, even biological relatives such as grandparents, the right to visit minor children against the parents' will. See Beagle v. Beagle, 678 So. 2d 1271, 1277 (Fla. 1996) (holding that the State cannot impose grandparent visitation upon a minor child "without first demonstrating a harm to the child").

Under this body of law, the trial court properly dismissed the former partner's complaint to establish parental rights and visitation. The former partner is not the birth mother. She is not a biological parent of the child in that she did not contribute biological or genetic material, such as an egg, as part of the child's conception. She has not adopted the child. And she was not married to the birth mother at the time the child was born. Regarding parental rights, "the law is clear: those who claim parentage on some basis other than biology or legal status do not have the same rights, including the right to visitation, as the biological or legal parents." Russell v. Pasik, 178 So. 3d 55, 59 (Fla. 2d DCA 2015).

Indeed, the facts in this case are remarkably similar to Wakeman v. Dixon, 921 So. 2d 669, 671 (Fla. 1st DCA 2006), in which the First District affirmed the dismissal of a former partner's complaint seeking to establish parental rights.

Wakeman and Dixon were a lesbian couple who had children pursuant to sperm donation agreements designating both Wakeman and Dixon as co-parents of the children, and providing that the non-birthing parent's relationship with the children would be secured. Pursuant to the agreements, Dixon gave birth to two children. Ultimately the couple separated and Dixon severed all ties between Wakeman and the children. Wakeman later filed a complaint against Dixon seeking a declaration recognizing her parental rights to the children.

The trial court dismissed Wakeman's complaint and the First District affirmed, holding "absent evidence of detriment to the child, courts have no authority to grant custody or to compel visitation by a person who is not a natural parent and that agreements providing for visitation by a non-parent are unenforceable." Id. at 669. The court observed, "[t]he Florida Supreme Court has held that, under the privacy provision in the Florida Constitution, a third party, even a grandparent, cannot be granted by statute the right to visitation with minor children, because, absent evidence of a demonstrable harm to the child, such a grant unconstitutionally interferes with a natural parent's privacy right to rear his or her child." Id. at 671.

Here, as the trial court correctly pointed out, there simply has been no showing of any harm to the child that would warrant government interference with the birth mother's right as the parent to control who has access to her child.

9

The former partner contends her position is supported by the Florida Supreme Court's decision of D.M.T. v. T.M.H., 129 So. 3d at 320. D.M.T. involved a parental rights dispute between a lesbian couple where one partner was the biological mother because she contributed her egg, while the other partner was the birth mother. The court held the constitutional right to privacy meant that the partner who contributed the egg could not be bound by a form contract she signed as part of the reproductive procedure in which she waived her parental rights. In doing so, the court emphasized that the form was intended to apply to anonymous egg donors and the facts clearly showed the couple intended to bear and raise the child together.

In the present case, the former partner seizes on this reasoning and notes she and the birth mother in the instant case also intended to bear and raise the child together. But the former partner is not the biological mother or birth mother. In D.M.T., the Florida Supreme Court expressly approved Wakeman's holding that the lesbian partner who was the birth mother had parental rights protected by the constitution that prevailed over the claims of a partner who was neither the biological nor legal mother, even though the couple clearly intended to raise the children together. Id. at 346.

As our Supreme Court has held, "[t]here may be many beneficial relationships for a child, but it is not for the government to decide with whom the child builds these

10

relationships. This concept implicates the very core of our constitutional freedoms and embodies the essence of Florida's constitutional right to privacy." <u>Von Eiff</u>, 720 So. 2d at 516. The child's life may well be enhanced by the additional financial, social, spiritual, and emotional support the former partner might provide. But whether the benefits of such support, from a former partner who is neither the biological or legal parent, outweigh possible detriments lies in the hands of the birth mother: the State of Florida cannot wrest that choice from her.